777 N.W.2d 829 (2010)
279 Neb. 320
STATE of Nebraska, appellee,
v.
Kyle J. BORMANN, appellant.
No. S-08-1281.
Supreme Court of Nebraska.
January 29, 2010.
*832 Thomas C. Riley, Douglas County Public Defender, for appellant.
Jon Bruning, Attorney General, and James D. Smith, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
WRIGHT, J.

I. NATURE OF CASE
Kyle J. Bormann was convicted of second degree murder and use of a firearm to commit a felony. He was sentenced to a term of 60 years to life in prison for the murder and a consecutive term of 20 to 30 years for use of the firearm. He appeals.

II. SCOPE OF REVIEW
In reviewing a motion to suppress a confession based on the claimed involuntariness of the statement, including claims that it was procured in violation of the safeguards established by the U.S. Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), an appellate court applies a two-part standard of review. With regard to historical facts, we review the trial court's findings for clear error. Whether those facts suffice to meet the constitutional standards, however, is a question of law, which we review independently of the trial *833 court's determination. State v. Goodwin, 278 Neb. 945, 774 N.W.2d 733 (2009).
Whether jury instructions given by a trial court are correct is a question of law. State v. Robinson, 278 Neb. 212, 769 N.W.2d 366 (2009). When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below. Id.

III. FACTS
On January 20, 2008, Brittany Williams was shot and killed as she sat in her car in the drive-through lane of a fast-food restaurant in Omaha, Nebraska. The bullet came from north of the restaurant and passed through the front passenger window, striking her in the head.
Police officers arrived at approximately 8:40 p.m. and used yellow police tape to preserve the crime scene. An alley immediately to the east of the restaurant was cordoned off. A vehicle driven by a male came south in the alley and drove through the crime scene tape. The vehicle then turned back and traveled north.
Officers pursued the vehicle into a parking lot several blocks north of the restaurant. The vehicle was driven over a curb and was resting against a picnic table just north of the parking lot. The driver got out of the vehicle holding a rifle. He discarded the rifle and ran. Officers caught up with him, and he was taken into custody. The rifle was secured and taken into evidence.
The male was handcuffed, and a search was conducted. Police found a spent shell casing in his jacket pocket. Officers detected a strong odor of alcohol, and the male had difficulty walking to the cruiser, where he was placed in the back seat.
At that point, the male was asked to provide his name and address and was identified as Bormann. He was asked no further questions, but he leaned forward from the back seat and said he wanted to tell the officer "what was going on." The officer told Bormann to sit back and relax.
Another officer standing immediately outside the cruiser told Bormann he was under arrest and not to ask any questions, but Bormann spoke again. Frustrated, the officer told Bormann to "shut the [expletive] up." The officer in the cruiser told Bormann, "I am not asking you any questions, but if you want to talk, I'm listening." Bormann said that he had been at home watching a professional football game on television and that he became upset due to officiating calls by the referees. Bormann said he became further upset, found his deer rifle, got into the car, and drove around. The officer in the cruiser said that Bormann "abruptly ended by saying [he] didn't shoot anybody." Bormann had not been given the warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), at that time.
Bormann was transported to the Omaha Police Department's headquarters by a third officer. Without being questioned, Bormann asked the third officer which team he preferred in the football game Bormann had been watching. A short while later, Bormann volunteered that he was "sorry for everything that happened tonight."
At police headquarters, Bormann was placed in an interview room. A videotape recording of the interview was received into evidence at trial over Bormann's objection. The videotape shows that Bormann was left alone for about 8 minutes before a detective entered and asked Bormann for identification. Bormann said he had none. The detective left, returned with a notepad, and asked Bormann for his name, date of birth, address, telephone *834 number, and Social Security number. Bormann was again left alone for about 20 minutes.
When the detective returned, Bormann had his head down on the table and appeared to be asleep. The detective roused Bormann and asked if he had any sharp instruments in his possession. The detective reviewed the biographical information he had obtained previously from Bormann and offered him water. The detective left the room, returned with water, and left again.
Approximately 8 minutes later, the detective returned. Bormann asked to call his parents. The detective said he would call them if it was necessary after he and Bormann talked for a while. Bormann was again asked for biographical information, including his age, name, date of birth, address, and previous address. Bormann described where he had lived for the prior several years and where he had attended high school. The detective explained that the questions were to ensure that Bormann understood English. Bormann said that he had good grades in high school and had attended 1 year of college. Bormann stated that he can read but has problems with comprehending what he has read.
Bormann said he understood what the detective was saying. He described his history of drug use and stated he had used marijuana a few weeks earlier. While in college, he used cocaine and had been charged with possession. He was not using cocaine at the time but had recently abused inhalants. He said he had been drinking that night while watching football on television and had consumed a bottle of whiskey.
Bormann was asked whether he took any prescription medication and whether he had any disabilities. He denied taking any medication other than Tylenol for headaches. Bormann was advised that the detective was trying to determine whether Bormann understood what was going on and to make sure Bormann understood what was being said.
The detective said he wanted to give Bormann a chance to talk. At that point, about 1 hour after the videotape began, Bormann was read the Miranda rights advisory. He signed the rights advisory form and eventually acknowledged that he had committed the homicide by shooting from his parked car into Williams' vehicle. He was unable to explain any reason for the shooting.
Bormann was charged with first degree murder and use of a deadly weapon to commit a felony. A motion to suppress his statements was overruled. The trial court found that Bormann's statements in the police cruiser were not the product of interrogation and did not require Miranda warnings because Bormann was not being interrogated. The court found no evidence of a police practice intended to elicit an incriminating response. The officer's direction to sit back and relax did not compel Bormann to talk. There was no evidence that Bormann was susceptible to persuasion. The court found that Bormann persisted in talking even when he was directed to remain quiet.
The trial court found that Bormann's statement while being transported to police headquarters was made freely and voluntarily. His statement that he was "sorry for everything that happened tonight" was spontaneous and therefore admissible. The court concluded that because Bormann's statement in the cruiser was admissible, his videotaped statement at police headquarters was not derivative of an earlier inadmissible statement.
The trial court found the videotaped statement was admissible as a "`routine booking exception'" to Miranda and that *835 the questions asked at the beginning of the interview fell within the routine booking exception. Although questions were asked about Bormann's use of drugs and alcohol, the questions were asked to determine whether Bormann was able to answer questions at that time.
The trial court determined that a brief reference to the death penalty made during the questioning of Bormann at police headquarters did not make his videotaped statement involuntary. The court found that the detective referred to the death penalty only briefly and did not use it as a threat or inducement.
The jury found Bormann guilty of second degree murder and use of a weapon to commit a felony. He was sentenced to a term of 60 years to life in prison on the murder conviction and a consecutive term of 20 to 30 years for the firearm conviction. He appeals.

IV. ASSIGNMENTS OF ERROR
Bormann's assignments of error, summarized and restated, claim that the trial court erred in admitting his statements into evidence. He argues the court erred in admitting the statement made in the police cruiser, because he was not given Miranda warnings prior to the statement. He claims that the videotaped statement was made without a knowing, voluntary, and intelligent waiver of the right to counsel and the right against self-incrimination and that the questioning exceeded the scope of the exception to Miranda for routine booking questions. Bormann also alleges that the videotaped statement at police headquarters was the product of threats, coercion, or inducements of leniency, in violation of the Due Process Clauses of the federal and state Constitutions. Bormann also claims that the court erred in giving a step jury instruction which deprived him of the due process right to have the jury consider his defense to the charges.

V. ANALYSIS

1. ADMISSION OF STATEMENTS

(a) Police Cruiser
The first officer testified that Bormann was placed in the back seat of the police cruiser and asked to provide his name and address. On two occasions, Bormann said he would like to talk. He was told to sit back and relax and not to ask any questions. Bormann appeared calm. He had watery eyes that were slightly bloodshot, and there was an odor of alcohol on his person. Bormann then volunteered that after becoming frustrated about the officiating of the football game he was watching, he got out his deer rifle and drove around. He said he had not shot anyone.
The second officer, who was standing outside the cruiser, testified that Bormann said he had been at home watching a football game, drinking, and getting upset with the referee because of some of the officiating calls he made. Bormann said that as the game progressed, he became more and more upset. He got dressed, grabbed his rifle, and started driving around. He finished his statement by saying, "I didn't shoot anybody tonight." Bormann argues his statement was inadmissible because he had not been given the Miranda warnings.
The safeguards provided by Miranda "come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." State v. McKinney, 273 Neb. 346, 364, 730 N.W.2d 74, 90 (2007). Miranda warnings are required only when there has been such a restriction on one's freedom as to render one "`in custody.'" State v. *836 McKinney, 273 Neb. at 364, 730 N.W.2d at 90-91, quoting State v. Mata, 266 Neb. 668, 668 N.W.2d 448 (2003). A person is in custody for purposes of Miranda "when there is a formal arrest or a restraint on one's freedom of movement to the degree associated with such an arrest." State v. McKinney, 273 Neb. at 364, 730 N.W.2d at 91. Bormann was handcuffed and placed in the back seat of a police cruiser. His freedom of movement was restrained. It is not disputed that he was in custody at the time he made the statements to the officers in and near the cruiser.
We then consider whether Bormann was interrogated while in the police cruiser. "`Interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." State v. Rogers, 277 Neb. 37, 54, 760 N.W.2d 35, 52 (2009). In Rhode Island v. Innis, 446 U.S. 291, 301-02, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (emphasis in original), the U.S. Supreme Court stated:
A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.
We have held that "[s]tatements made in a conversation initiated by the accused or spontaneously volunteered by the accused are not the result of interrogation and are admissible." State v. Rodriguez, 272 Neb. 930, 944, 726 N.W.2d 157, 171 (2007). In addition, the definition of interrogation excludes "a course of inquiry related and responsive to a volunteered remark." Id.
In interpreting Rhode Island v. Innis, supra, this court has stated that an objective standard is applied to determine whether there is interrogation within the meaning of Miranda. See State v. Gibson, 228 Neb. 455, 422 N.W.2d 570 (1988). The question to be answered is as follows:
Would a reasonable and disinterested person conclude that police conduct, directed to a suspect or defendant in custody, would likely elicit an incriminating response from that suspect or defendant?... If the answer is "yes," there is interrogation requiring the Miranda warning before a defendant's incriminating response is constitutionally admissible as evidence against the defendant.
Id. at 463, 422 N.W.2d at 575.
Both officers in and near the cruiser testified that Bormann's statements while he was in the cruiser were volunteered. Neither of the officers elicited a response by beginning a conversation with Bormann. He was asked for his name and address in order for the officers to conduct a background check on him. This information was collected for arrest and did not require Miranda warnings.
Neither officer took any action that elicited an incriminating response from Bormann. The officers cannot be held accountable for Bormann's response. They asked no questions beyond obtaining information for identification purposes. "[I]nterrogation occurs when a person is placed under a compulsion to speak." State v. Rodriguez, 272 Neb. at 943, 726 N.W.2d at 171. Bormann was not compelled to talk to the officers by their actions or statements. He voluntarily asked to talk to the officers, who discouraged *837 him from doing so. Bormann continued to talk even when he was told not to speak. There was no interrogation in the police cruiser.
We conclude that Bormann was not subjected to interrogation while sitting in the police cruiser at the scene or while being transported to police headquarters. The statements made by Bormann were voluntary and were not the result of interrogation. Therefore, they were admissible. The trial court did not err in allowing such statements to be admitted into evidence.

(b) Interview Room
Bormann claims that the videotaped statement at police headquarters should be inadmissible because it includes 20 minutes of questioning before he was administered the Miranda warnings. The trial court found the statement to be admissible. See Pennsylvania v. Muniz, 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (routine booking exception allows collection of questions to secure biographical data necessary to complete booking or pretrial services without administration of Miranda warnings).
We conclude that the information obtained went beyond the collection of facts necessary for routine booking. However, this does not mean that the evidence was inadmissible. The information, while beyond that necessary for a routine booking, was obtained in order to determine if Bormann was competent to talk to police.
Information obtained in initial questioning is not necessarily considered interrogation under Miranda. U.S. v. Brown, 101 F.3d 1272 (8th Cir.1996). The court stated:
"A request for routine information necessary for basic identification purposes is not interrogation under Miranda, even if the information turns out to be incriminating. Only if the government agent should reasonably be aware that the information sought, while merely for basic identification purposes in the usual case, is directly relevant to the substantive offense charged, will the question be subject to scrutiny."
Id. at 1274, quoting United States v. McLaughlin, 777 F.2d 388 (8th Cir.1985).
Bormann was in an interrogation room for about 45 minutes before the Miranda rights were administered. He was alone for more than 15 minutes before the detective entered and asked for identification. Bormann had none, and the detective obtained a notepad and asked Bormann for his name, date of birth, address, telephone number, and Social Security number. The detective left, returned, and asked Bormann if he had any sharp instruments in his possession. Biographical information was reviewed, and Bormann was offered water. The detective left to retrieve the water, returned with it, and left again.
The detective returned and again asked for biographical information. Bormann voluntarily described where he had lived for the previous several years. The detective asked Bormann about his educational background to ensure that Bormann understood the questions.
Because the detective smelled the odor of alcohol, he asked for Bormann's drug and alcohol history. Bormann said he had last used marijuana a few weeks earlier. He had previously used cocaine and had once been charged with possession. Bormann said he had recently abused inhalants. Bormann said he had been drinking that night while he was watching a football game and had consumed a bottle of whiskey.
The detective said he was trying to determine whether Bormann understood what was happening. He asked whether Bormann had taken any prescription medication *838 and whether he had any disabilities. Bormann denied taking any medication other than Tylenol for headaches.
The detective said he wanted to give Bormann a chance to talk. Bormann then said he had possession of a high-powered rifle that night, but that he had not shot at any police. At that point, about 1 hour after the videotape began, the detective read the Miranda rights advisory to Bormann, and he signed the rights advisory form.
In reviewing a motion to suppress a confession based on the claimed involuntariness of the statement, including claims that it was procured in violation of the safeguards established by the U.S. Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), an appellate court applies a two-part standard of review. With regard to historical facts, we review the trial court's findings for clear error. Whether those facts suffice to meet the constitutional standards, however, is a question of law, which we review independently of the trial court's determination. State v. Goodwin, 278 Neb. 945, 774 N.W.2d 733 (2009).
The issue is whether Bormann's statements prior to being given the Miranda warning tainted his waiver such that the statements cannot be said to be freely and voluntarily given.
"It is an unwarranted extension of Miranda to say that an unwarned statement `so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.'" State v. Ray, 266 Neb. 659, 665, 668 N.W.2d 52, 57 (2003), quoting Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). We conclude that Bormann's pre-Miranda statement did not render his post-Miranda statements inadmissible.
The pre-Miranda questions concerned basic identification and Bormann's ability to understand the nature of the questioning. Bormann smelled of alcohol and had consumed an entire bottle of whiskey the day of the shooting. He had previously told police that he had a high-powered rifle and that he had not shot at any police. This statement cannot be said to have tainted the voluntariness of his waiver. Bormann's statement concerning his drug use was not related to the shooting incident and provided basic information relating to his physical and mental condition.
The trial court did not err in finding that Bormann's videotaped statement was voluntary. The questioning prior to the time Bormann was given his Miranda advisory did not affect the voluntariness of Bormann's post-Miranda statements. Bormann freely and voluntarily executed the waiver of his Miranda rights.

(c) Product of Threats, Coercion, or Inducements
Bormann argues that the videotaped statement was inadmissible because it was the product of threats, coercion, or inducements. He claims his due process rights were violated when the detective mentioned the death penalty during the interrogation.
After Bormann was given the Miranda warnings, he was asked to describe his activity that day. Bormann stated he had slept until 3:30 p.m. and then began watching football. Bormann said he started drinking during an earlier football game. He did not remember more than the first quarter of the second game, but said he became upset when the team he was a fan of was losing. He did not remember the reason he left his house.
During the interview, Bormann continued to deny that he remembered any of his actions. Gradually, he recalled details of *839 the day. He admitted that he fired the rifle while sitting in the driver's seat of his vehicle. Bormann stated he did not know why he left his house. The detective asked Bormann what his target was, because he wanted to make sure that Bormann did not go out looking for a specific person, which would be premeditated murder. Bormann was asked if he understood the meaning of premeditated murder. The detective stated, "That means death penalty." Bormann did not respond. The interview continued for another 30 minutes, at which time Bormann admitted that he shot at a car in the drive-through lane of a fast-food restaurant.
Bormann argues that the detective's comments about the death penalty made Bormann's statement involuntary.
A statement of a suspect, to be admissible, must be shown by the State to have been given freely and voluntarily and not to have been the product of any promise or inducementdirect, indirect, or impliedno matter how slight. However, this rule is not to be applied on a strict, per se basis. Rather, determinations of voluntariness are based upon an assessment of all of the circumstances and factors surrounding the occurrence when the statement is made.
State v. McPherson, 266 Neb. 734, 740-41, 668 N.W.2d 504, 511 (2003). The Due Process Clauses of the U.S. and Nebraska Constitutions preclude admissibility of an involuntary confession. State v. Garner, 260 Neb. 41, 614 N.W.2d 319 (2000), citing U.S. Const. amend. XIV and Neb. Const. art. I, § 3. The State has the burden to prove that a defendant's statement was voluntary and not coerced. State v. Garner, supra. In determining whether a Miranda waiver is knowingly and voluntarily made, a court applies a totality of the circumstances test. Factors to be considered include the suspect's age, education, intelligence, prior contact with authorities, and conduct. State v. Goodwin, 278 Neb. 945, 774 N.W.2d 733 (2009).
In State v. Garner, 260 Neb. at 46, 614 N.W.2d at 325, a detective told the defendant, a 15-year-old who was suspected of killing an elderly woman, that people would "`want to stick you in the electric chair and burn your butt forever for killing an 83-year-old white woman, when there may be more to it than that.'" The defendant then confessed to the murder.
On appeal, the defendant contended that his confession was involuntary because it was the product of threats, coercion, and inducements of leniency. He argued that his age, the time of day, and the fact he had no attorney or parent present affected the voluntariness of his confession. We stated that the confession of an accused may be involuntary and inadmissible if obtained in exchange for a promise of leniency. "However, mere advice or exhortation by the police that it would be better for the accused to tell the truth, when unaccompanied by either a threat or promise, does not make a subsequent confession involuntary." State v. Garner, 260 Neb. at 50, 614 N.W.2d at 327. In order to render a statement involuntary, any benefit offered to a defendant must be definite and must overbear his or her free will. Id. We concluded that because the detective did not refer to the death penalty in connection with an explicit threat or promise of leniency, the confession was not involuntary. Id.
The U.S. Supreme Court has held that "coercive police activity is a necessary predicate to the finding that a confession is not `voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). "`[The] circumstances surrounding *840 the statement and the characteristics of the individual defendant at the time of the statement are potentially material considerations ....'" State v. Ray, 266 Neb. 659, 666, 668 N.W.2d 52, 57 (2003).
In the case at bar, the detective's reference to the death penalty was not made as a threat or inducement. He was pointing out to Bormann the seriousness of the crime and differentiating premeditated murder from other grades of homicide. The videotape does not suggest that the detective's actions resulted in Bormann's will being overborne.
The trial court's findings of historical fact are not clearly erroneous. They are fully supported by the record. Based upon our independent review of the totality of the circumstances, we conclude that the videotaped statement by Bormann was voluntary. The trial court did not err in admitting the videotape into evidence.

2. STEP JURY INSTRUCTION
Bormann's final assignment of error claims the trial court erred in giving a step jury instruction that deprived him of his due process right to have the jury consider his defense to the charges. The jury was given the following instruction:
Under Count I of the Information, depending on evidence which you find that the State has proved beyond a reasonable doubt, you may find ... Bormann:
(1) Guilty of murder in the first degree; or
(2) Guilty of murder in the second degree; or
(3) Guilty of manslaughter; or
(4) Not guilty.
The instruction included three sections, each of which spelled out the material elements for the three grades of homicide. Each instruction then stated that if the jury found from the evidence beyond a reasonable doubt that each and every one of the material elements set out in that section was true, the jury should find the defendant guilty of that crime. Each instruction went on to state: "If, on the other hand, you find that the State has failed to prove beyond a reasonable doubt any one or more of the material elements" in that section, the jury should find Bormann not guilty of that crime. The instruction then directed the jury to "proceed to consider the lesser-included offense."
Bormann's theory of defense was that he lacked the intent to kill and that, therefore, he could only have been found guilty of manslaughter. He claims that the step instruction violated his due process rights because it did not allow the jury to consider his theory. The determination of whether procedures afforded an individual comport with constitutional requirements for procedural due process presents a question of law. State v. Goodwin, 278 Neb. 945, 774 N.W.2d 733 (2009). On questions of law, a reviewing court has an obligation to reach its own conclusions independent of those reached by the lower courts. Id.
In State v. Goodwin, supra, we recently addressed an argument similar to Bormann's argument. We agreed with other courts which have held that so-called acquittal first step instructions are not constitutionally deficient. As with State v. Goodwin, supra, the step instruction given in this case did not prevent the jury from considering the critical issue of whether Bormann had formed an intent to kill when he fired the fatal shot. Bormann was not precluded from offering evidence to support his theory of defense, nor was his counsel restricted from arguing that Bormann did not have the intent to kill *841 and should therefore be found guilty of the lesser offense of manslaughter.
There was no prejudice to Bormann when the jury acquitted him of first degree murder. Pursuant to the step instruction, the jury was then required to consider whether the State had proved all the elements of second degree murder. Once the jury found that the State had proved each element of second degree murder beyond a reasonable doubt, Bormann's defense of manslaughter was no longer relevant. The jury found that Bormann intentionally killed Williams. The step instruction did not violate Bormann's constitutional right to present a complete defense. It was perfectly logical for the jury to conclude that when Bormann pointed and fired his high-powered rifle at Williams, he possessed the intent to kill.

VI. CONCLUSION
The trial court did not err in admitting Bormann's statements into evidence or in its instructions to the jury. The convictions and sentences are affirmed.
AFFIRMED.