State of Nebraska, appellee, v.
Michael L. Juranek, appellant.
___ N.W.2d ___

Filed April 4, 2014.    No. S-13-542.

1.  **Motions to Suppress: Confessions: Constitutional Law: Miranda Rights: Appeal and Error.** In reviewing a motion to suppress a confession based on the claimed involuntariness of the statement, including claims that it was procured in violation of the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. With regard to historical facts, the appellate court reviews the trial court's findings for clear error. Whether those facts suffice to meet the constitutional standards, however, is a question of law, which the appellate court reviews independently of the trial court's determination.

2.  **Criminal Law: Convictions: Evidence: Appeal and Error.** When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence.

3.  **Constitutional Law: Miranda Rights: Self-Incrimination.** *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prohibits the use of statements derived during custodial interrogation unless the prosecution demonstrates the use of procedural safeguards that are effective to secure the privilege against self-incrimination.

4.  **Miranda Rights: Self-Incrimination.** *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), requires law enforcement to give a particular set of warnings to a person in custody before interrogation: that he has the right to remain silent, that any statement he makes may be used as evidence against him, and that he has the right to an attorney, either retained or appointed.

5.  **Miranda Rights: Police Officers and Sheriffs: Words and Phrases.** For purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), interrogation refers not only to express questioning, but also to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect.

6.  **Constitutional Law: Miranda Rights: Arrests: Words and Phrases.** A person is in custody for purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), when there is a formal arrest or a restraint on one's freedom of movement to the degree associated with such an arrest.

7.  **Miranda Rights.** *Miranda* protections apply only when a person is both in custody and subject to interrogation.

8.  **Miranda Rights: Police Officers and Sheriffs.** An individual is in custody for purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), when handcuffed and placed in the back seat of a police cruiser.

9. **Confessions.** Statements that are spontaneously volunteered by the accused are not the result of interrogation and are admissible.

10. **Miranda Rights: Police Officers and Sheriffs: Words and Phrases.** The definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.

11. **Constitutional Law: Self-Incrimination.** The Fifth Amendment privilege against self-incrimination is fundamental to the United States' system of constitutional rule.

12. **Confessions.** Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his or her free choice.

13. **Trial: Evidence: Appeal and Error.** The improper admission of evidence is a trial error and subject to harmless error review.

14. **Verdicts: Juries: Appeal and Error.** Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error.

15. **Trial: Evidence: Appeal and Error.** Erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact.

Appeal from the District Court for Douglas County: Gary B. Randall, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Kelly M. Steenbock for appellant.

Jon Bruning, Attorney General, and George R. Love for appellee.

Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Wright, J.

## I. NATURE OF CASE

Michael L. Juranek unsuccessfully moved to suppress his statements made to police during the investigation of the stabbing of Jimmy McBride. At his trial for first degree murder and use of a deadly weapon to commit a felony, the district court admitted evidence of the statements over Juranek's objections. Juranek now challenges the district court's decision not to suppress the statements and also raises sufficiency of the

evidence as to his convictions for first degree murder and use of a deadly weapon to commit a felony. We find no error in the admission of two of Juranek's statements and harmless error in the admission of the third. Ultimately, we conclude that there was sufficient evidence to find Juranek guilty, and we affirm his convictions and sentences.

## II. SCOPE OF REVIEW

[1] In reviewing a motion to suppress a confession based on the claimed involuntariness of the statement, including claims that it was procured in violation of the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. With regard to historical facts, we review the trial court's findings for clear error. Whether those facts suffice to meet the constitutional standards, however, is a question of law, which we review independently of the trial court's determination. *State v. Bormann*, 279 Neb. 320, 777 N.W.2d 829 (2010).

[2] When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. *State v. McGuire*, 286 Neb. 494, 837 N.W.2d 767 (2013).

## III. FACTS

On September 14, 2011, Officer Brandon Braun of the Omaha Police Department responded to a 911 emergency dispatch service call concerning a "cutting" or stabbing. Upon arriving at the scene, Braun located "a male subject that [had] blood on his shirt." The subject, whom Braun recognized as McBride, mentioned the name "Mike" and pointed to a male about 100 feet away who was wearing a dark shirt and carrying a dark-colored bag. Because Braun was the only officer

at the scene at that time, he relayed the description to other officers who could attempt to detain the suspect. McBride later died from his wound.

En route to the scene of the stabbing, Officer Aaron Andersen of the Omaha Police Department saw an individual matching the description relayed by Braun. The individual was later identified as Juranek. Andersen, whose police cruiser window was rolled down, pulled up to Juranek and yelled, "'Hey.'" Andersen did not pull in front of Juranek or order him to stop. Juranek turned around, and Andersen observed that Juranek was "bleeding from [one of] his eye[s]." Without exiting the cruiser, Andersen asked Juranek what had happened to his eye. Juranek responded, "He threatened me so I stuck him." At that point, Andersen exited the cruiser, handcuffed Juranek, and placed him in the cruiser.

While Andersen drove Juranek to the scene of the stabbing, Andersen heard Juranek "making several statements to himself." Specifically, Andersen heard Juranek say that "he stuck him once," "he wanted to stick him again," and "he wanted to kill him." Andersen had not asked any questions of Juranek or engaged him in conversation.

After informing the officers at the scene of the stabbing that he had detained Juranek, Andersen drove Juranek to the police station and took him to an interview room. Shortly thereafter, a detective with the Omaha Police Department began to interview Juranek. The video recording from the interview shows that the detective started the interview by attempting to shake Juranek's hand, which Juranek declined because his hands were "dirty." The following dialog then took place:

> Detective: Okay, sir. I'm, uh, was speaking with the officer that brought you down here and he shared some information, so—
>
> Juranek: I told it to him 14 times.
>
> Detective: Ok. Do you want to tell it to me?
>
> Juranek: The asshole's name was Jimmy McBride. He threatened to kill me. I took a knife, and I stuck him. I would have stuck him again, but he ran away. And after that I don't know what happened. He hand—, I was a

block away and he handcuffed me and wanted to know where the knife was. I don't even, after I stabbed that piece of shit, I don't remember anything. I'm guilty.

Detective: [after about 10 seconds of silence] Um. I want to read you these six statements here with yes or no questions, okay?

The detective then read Juranek the *Miranda* warnings. After Juranek waived his *Miranda* rights, the detective thoroughly interviewed Juranek about McBride and the stabbing.

Juranek was charged by complaint with first degree murder and use of a deadly weapon to commit a felony. The county court determined there was probable cause for the complaint and bound Juranek over to the district court. In district court, Juranek was charged by information with the same crimes. He entered pleas of not guilty to both counts.

Before trial, Juranek moved to suppress "any and all statements" that he made to the police officers. He argued that the statements were obtained contrary to the 4th, 5th, 6th, and 14th Amendments to the U.S. Constitution and article I, §§ 7 and 12, of the Nebraska Constitution, because the statements were (1) the fruit of an unlawful detention and arrest; (2) neither freely and voluntarily given nor knowingly, understandingly, and intelligently made; (3) made before he was informed of his rights; (4) made without a knowing, understanding, and intelligent waiver of his rights; (5) the result of questions that "the police should have known were reasonably likely to elicit an incriminatory response"; and (6) made after he "unequivocally invoked his right to cut off questioning."

The district court overruled Juranek's motion to suppress. The court made no specific findings in relation to Juranek's statements before he was detained and while he was in the police cruiser. The court briefly explained that the detective's question at the start of Juranek's interview was "not intended to elicit a confession but rather to determine whether [Juranek] was in fact willing to talk," citing to *Oregon v. Elstad*, 470 U.S. 298, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985).

At a bench trial, the State adduced evidence of the statements challenged in Juranek's motion to suppress. The court overruled Juranek's objections and received the evidence. In

testifying to Juranek's statements during the interrogation, the detective stated that he did not read the *Miranda* warnings prior to asking whether Juranek would tell him what had happened, because the question was not intended to elicit a substantive response. When asked why he conducted the interview in the manner that he did, the detective explained, "I was concerned that [Juranek] wasn't wanting to speak with me at all. Therefore, I asked the question. My intent was to see if I was going to be wasting my time trying to talk to him if he did not want to speak with me at all." The detective said that he did not read Juranek the *Miranda* warnings at the outset of the interview because the detective was trying to "build a rapport."

The entire video recording of Juranek's interrogation was received into evidence over his objection. The video recording showed that after waiving his *Miranda* rights, Juranek confessed multiple times to seeking out McBride with the explicit purpose of killing him and to stabbing McBride under the left rib cage. He also stated that he would stab McBride again.

The State adduced testimony from two individuals who witnessed the stabbing. One witness testified that on September 14, 2011, she saw a fight between two older males, one of whom she identified as Juranek. According to this witness, Juranek "[s]hoved [the other man] in the chest," followed the other man as he tried to get away, and then "pushed" the other man a second time. She said that the two men were punching each other and then "[a]ll of [a] sudden," the other man "started screaming and lifted up his shirt" to reveal blood on his left side. The witness' boyfriend also witnessed the incident. However, the boyfriend described what he saw as one man "chasing the other guy" and "swinging . . . at him." The boyfriend said that the one man "was punching somewhere right here in the ribs. And then after a little bit, after he did that, he walked away, and the guy dropped, fell on the floor." The boyfriend could not identify either man as Juranek.

The district court found Juranek guilty of both first degree murder and use of a deadly weapon to commit a felony. The

court sentenced Juranek to life imprisonment and 5 to 10 years' imprisonment, respectively.

Juranek timely appeals. We have a statutory obligation to hear all appeals in cases where the defendant is sentenced to life imprisonment. See Neb. Rev. Stat. § 24-1106(1) (Reissue 2008).

## IV. ASSIGNMENTS OF ERROR

Juranek assigns that the district court erred in overruling his motion to suppress and in entering judgment based on evidence insufficient to prove guilt beyond a reasonable doubt.

## V. ANALYSIS

### 1. Suppression of Evidence

#### (a) Background

[3,4] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prohibits the use of statements derived during custodial interrogation unless the prosecution demonstrates the use of procedural safeguards that are effective to secure the privilege against self-incrimination. *State v. Rodriguez*, 272 Neb. 930, 726 N.W.2d 157 (2007). *Miranda* requires "law enforcement to give a particular set of warnings to a person in custody before interrogation: that he has the right to remain silent, that any statement he makes may be used as evidence against him, and that he has the right to an attorney, either retained or appointed." *State v. Nave*, 284 Neb. 477, 492, 821 N.W.2d 723, 735 (2012), *cert. denied* ___ U.S. ___, 133 S. Ct. 1595, 185 L. Ed. 2d 591 (2013).

[5] For purposes of *Miranda*, interrogation "refers not only to express questioning, 'but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *State v. Bauldwin*, 283 Neb. 678, 700, 811 N.W.2d 267, 286 (2012) (ellipsis in original) (quoting *State v. Rogers*, 277 Neb. 37, 760 N.W.2d 35 (2009)). But "'[s]tatements made in a conversation initiated by the accused or spontaneously volunteered by the accused are not the result of interrogation

and are admissible.'" *State v. Bormann*, 279 Neb. 320, 327, 777 N.W.2d 829, 836 (2010) (alteration in original) (quoting *Rodriguez, supra*).

#### (b) Whether Admission of Juranek's Statements Violated *Miranda*

##### *(i) Statement Before Detention*

[6] Juranek's statement in response to the officer's question about Juranek's eye was not made while he was in custody. A person is in custody for purposes of *Miranda* when there is a formal arrest or a restraint on one's freedom of movement to the degree associated with such an arrest. *State v. Landis*, 281 Neb. 139, 794 N.W.2d 151 (2011). The individual must be "deprived of [his or her] freedom of action in any significant way." *Rodriguez*, 272 Neb. at 943, 726 N.W.2d at 171.

When Juranek said, "He threatened me so I stuck him," he had not been arrested or detained. Indeed, the evidence shows that Juranek's freedom of movement was not at all limited by Andersen's presence. When Andersen's cruiser approached Juranek, Andersen did not pull the police cruiser in front of Juranek so as to block his way. Andersen did not exit the cruiser or make any attempt to get in close proximity to Juranek. Andersen did not order Juranek to stop. Neither did Andersen make any statements that suggested Juranek was a suspect in a crime or in any way being detained by the police. Rather, Andersen got Juranek's attention by yelling "'Hey'" from inside the cruiser. Juranek was not required to stay and answer Andersen's questions. Because Juranek's freedom of movement was in no way restricted at the time he made the statement, we conclude that the statement was not made while Juranek was in custody.

[7] *Miranda* protections apply only when a person is both in custody and subject to interrogation. *Bauldwin, supra*. Therefore, because Juranek's statement in response to the question about his eye was not made while he was in custody, *Miranda* was not implicated. The district court did not err in admitting this statement into evidence.

### (ii) Statements in Cruiser

[8] This court has previously held that an individual is in custody for purposes of *Miranda* when "handcuffed and placed in the back seat of a police cruiser." See *Bormann*, 279 Neb. at 326, 777 N.W.2d at 836. Thus, Juranek's statements in the police cruiser were made while he was in custody.

[9] But Juranek's statements in the police cruiser were not the result of interrogation. Juranek had neither been asked questions nor engaged in conversation by Andersen. And there was no evidence that Andersen took any action that would have produced a verbal response from Juranek. Indeed, Juranek appeared to be talking "to himself" as opposed to Andersen. Based on these facts, we conclude that Juranek spontaneously volunteered the statements in the cruiser that he "stuck him once," "wanted to stick him again," and "wanted to kill him." Statements that are "'spontaneously volunteered by the accused are not the result of interrogation and are admissible.'" *State v. Bormann*, 279 Neb. 320, 327, 777 N.W.2d 829, 836 (2010) (quoting *State v. Rodriguez*, 272 Neb. 930, 726 N.W.2d 157 (2007)). Juranek's statements in the cruiser were not the result of interrogation.

Because Juranek's statements in the cruiser were not the result of interrogation, they were admissible despite the fact that he had not been given the *Miranda* warnings. The district court did not err in admitting the statements into evidence.

### (iii) Statement in Response to Question "Do you want to tell it to me?"

#### a. Immediate Response

The difficult issue is whether Juranek's response to the detective's question, "Do you want to tell it to me?" was admissible in the absence of prior *Miranda* warnings. For the following reasons, we find that the district court erred in admitting the statement.

At the time of this statement, Juranek was in custody. Juranek had been handcuffed, driven to the police station in a cruiser, and placed in an interview room for interrogation. Accordingly, the admissibility of Juranek's statement will depend on whether it was the result of interrogation.

[10] For purposes of *Miranda*, interrogation can be "express questioning" or "'any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *State v. Bauldwin*, 283 Neb. 678, 700, 811 N.W.2d 267, 286 (2012) (ellipsis in original) (quoting *State v. Rogers*, 277 Neb. 37, 760 N.W.2d 35 (2009)). In determining whether there is interrogation, the question is: "'Would a reasonable and disinterested person conclude that police conduct, directed to a suspect or defendant in custody, would likely elicit an incriminating response from that suspect or defendant?'" *Bormann*, 279 Neb. at 327, 777 N.W.2d at 836 (quoting *State v. Gibson*, 228 Neb. 455, 422 N.W.2d 570 (1988)).

> "A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response."

*Id.* at 327, 777 N.W.2d at 836 (emphasis in original) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980)).

We apply an objective standard in determining whether a defendant's response was the result of interrogation. See *Bormann, supra*. For this reason, whether a defendant was being interrogated does not depend on the officer's intent in asking the question that elicited an incriminating response. In the instant case, the detective's testimony that his intentions were to find out if Juranek was willing to talk in general and to "build a rapport" with Juranek is not material to our consideration. The issue is whether the detective should have known that his question to Juranek was likely to elicit an incriminating response. We conclude the detective should have known his question was likely to elicit an incriminating response.

Within the context of Juranek's and the detective's prior statements in the interview, the question "Do you want to tell

it to me?" was an explicit invitation for Juranek to tell the detective what had happened that day. The detective asked the question in response to Juranek's statement that he had already told "it" to Andersen "14 times." A reasonable person would have understood the detective's use of the word "it" to be a reference to the same "it" that Juranek said he had told Andersen. Juranek had previously confessed to Andersen. Prior to the interview, the detective learned of these confessions from Andersen. And Juranek knew that the detective was aware of the confessions, because Juranek said that he had told "it" to Andersen 14 times in direct response to the detective's mention of "some information" that Andersen had shared prior to the interview. Thus, "it" was clearly a reference to the confessions that Juranek made to Andersen. Because of the manner in which the detective's question built upon previous uses of the word "it" in the interview, a reasonable person would have understood the question to be an invitation for Juranek to tell the detective what Juranek had previously told Andersen. Therefore, the detective's question was an attempt to elicit a statement from Juranek regarding his prior confessions to the stabbing of McBride.

Moreover, the detective knew about Juranek's propensity to talk without being interrogated and should have expected that if asked about the incident, Juranek would confess again. The detective knew that before Juranek was in custody and again while Juranek was being transported to the police station, he had confessed to the stabbing. A reasonable and disinterested person with such knowledge would have had little doubt that once confronted by the police, Juranek was likely to make an incriminating statement again. Because Juranek had previously given incriminating statements on two separate occasions and because Juranek was aware that the detective knew of those statements, the detective should have known that reference to those statements might prompt Juranek to repeat what he had previously confessed to Andersen.

Once the detective mentioned that he knew of Juranek's prior statements to Andersen, the interrogation had begun and Juranek should have been given the procedural safeguards required by *Miranda*. These warnings are "an absolute

prerequisite to interrogation," see *Miranda v. Arizona*, 384 U.S. 436, 471, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and "fundamental with respect to the Fifth Amendment privilege," *Miranda*, 384 U.S. at 476.

The detective testified that "[n]othing was stopping [him]" from giving the *Miranda* warnings before asking any questions of Juranek. Indeed, less than 1 minute later, when Juranek was advised of the *Miranda* rights, the detective used a series of scripted questions that concluded by asking, "Knowing your rights in this matter, are you willing to speak with me?" The detective admitted that this final question was another way of asking whether Juranek was willing to speak with the detective and would have accomplished the same objectives while also advising Juranek of the *Miranda* rights.

[11] Before Juranek said anything in the interview, it would have required no effort for the detective to advise Juranek that he had the right to remain silent, that any statement he made could be used as evidence against him, and that he had the right to an attorney, either retained or appointed. See, *Miranda, supra*; *State v. Nave*, 284 Neb. 477, 821 N.W.2d 723 (2012), *cert. denied* ___ U.S. ___, 133 S. Ct. 1595, 185 L. Ed. 2d 591 (2013). As the U.S. Supreme Court has noted, the Fifth Amendment privilege against self-incrimination is "fundamental to our system of constitutional rule." See *Miranda*, 384 U.S. at 468. Yet, "the expedient of giving an adequate warning as to the availability of the privilege [is] so simple." *Id*. Juranek should have been given the *Miranda* warnings before he was interrogated.

As this case illustrates, questions intended to build a rapport with a defendant can easily cross the line into interrogation. The obvious goal of building a rapport is to entice a defendant to talk, at first perhaps about general matters, but ultimately about the crime being investigated. See, *State v. Hughes*, 272 S.W.3d 246, 255 (Mo. App. 2008) (officer builds rapport "to facilitate . . . further interrogation"); Richard A. Leo, *Questioning the Relevance of* Miranda *in the Twenty-First Century*, 99 Mich. L. Rev. 1000, 1018 (2001) ("rapport-building small talk" used by interrogators to minimize significance of *Miranda* and thereby elicit waiver). As

an interview moves toward the subject of the investigation, it becomes more likely that an officer's questions will elicit an incriminating response. Because an officer cannot be held accountable for unforeseeable results of his or her questions, we focus on whether, when asking any particular question, an officer *should have known* that the question was likely to elicit an incriminating response. See *State v. Bormann*, 279 Neb. 320, 777 N.W.2d 829 (2010). In the instant case, the particular circumstances surrounding Juranek's custody and the specific context of the detective's question were such that the detective *should have known* that his question would elicit an incriminating response.

[12] Juranek's statement in response to the question "Do you want to tell it to me?" was the result of a custodial interrogation conducted without *Miranda* warnings. Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his or her free choice. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The district court erred in admitting Juranek's response to the question.

### b. Statements Following
### *Miranda* Advisement

After Juranek was given the *Miranda* warnings, he waived his rights and agreed to talk to the detective. During the remainder of the interview, Juranek made numerous other incriminating statements that repeated his unwarned confession. Juranek argues that because he confessed before receiving the *Miranda* warnings, his subsequent waiver was not voluntary, and that his post-*Miranda* confessions should also be excluded. We do not agree.

Juranek's argument is based on *Missouri v. Seibert*, 542 U.S. 600, 604, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004), in which the U.S. Supreme Court addressed the two-step interrogation technique of (1) giving *Miranda* warnings only after interrogation has produced a confession and then (2) questioning the suspect so as to "cover the same ground a second time," but this time with *Miranda* warnings. A plurality of the Court

concluded that "when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and 'depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" See *Seibert*, 542 U.S. at 613-14 (alteration in original) (quoting *Moran v. Burbine*, 475 U.S. 412, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986)). The plurality explained that when a suspect is advised of his or her *Miranda* rights in the middle of an interrogation, the issue becomes whether the warnings effectively advised that he or she "could choose to stop talking even if he [or she] had talked earlier." See *Seibert*, 542 U.S. at 612.

Before *Seibert*, the U.S. Supreme Court had rejected this approach. In *Oregon v. Elstad*, 470 U.S. 298, 309, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985), the Court addressed the identical question and concluded that

> [i]t is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.

In *Seibert*, 542 U.S. at 615, the U.S. Supreme Court distinguished *Elstad* based on facts in *Seibert* that indicated the *Miranda* warnings, given after interrogation produced a confession, were not "effective enough to accomplish their object." The Court mentioned the following facts as possible indicators that the *Miranda* warnings were ineffective:

> the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

See *Seibert*, 542 U.S. at 615. Of particular significance to the Court's conclusion that Seibert's pre-*Miranda* confession made the later *Miranda* warnings ineffective was the fact the questioning before the *Miranda* warnings was "systematic,

exhaustive, and managed with psychological skill" to such an extent that after the unwarned interrogation, "there was little, if anything, of incriminating potential left unsaid." See *Seibert*, 542 U.S. at 616.

Since *Seibert*, the U.S. Supreme Court has concluded that the two-step interrogation technique condemned in *Seibert* is not necessarily present in every scenario involving the pairing of unwarned and warned interrogations. In *Bobby v. Dixon*, ___ U.S. ___, 132 S. Ct. 26, 181 L. Ed. 2d 328 (2011), the Court declined to hold a defendant's waiver of his *Miranda* rights ineffective for the reason that the circumstances surrounding the interrogation distinguished it from the two-step interrogation technique condemned in *Seibert*.

In the case at bar, the facts are readily distinguishable from *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004). The circumstances of the pre- and post-*Miranda* interrogations of Juranek did not rise to the level of making the *Miranda* warnings ineffective. Considering that the detective asked one question before Juranek made his confession and that Juranek was given the *Miranda* warnings approximately 2 minutes into the interrogation, we cannot say that the pre-*Miranda* interrogation left little to be said. In *Seibert*, the questions before the *Miranda* warning were systematic, exhaustive, and managed with psychological skill. Here, the pre-*Miranda* interrogation of Juranek lasted less than 2 minutes. It did not touch upon key points in the investigation, such as how Juranek knew McBride, how the stabbing occurred, or where the weapon Juranek used could be found. The facts are sufficiently distinguishable from those in *Seibert*.

Juranek's pre-*Miranda* confession did not render ineffective the *Miranda* warnings that he was given less than a minute later. In light of Juranek's waiver of his *Miranda* rights, the statements he made after he was given the *Miranda* warnings were admissible.

### c. Harmless Error

The district court erred in admitting evidence of Juranek's confession during the pre-*Miranda* interrogation. However, we

conclude that this evidence was cumulative to other admissible evidence and that its admission was harmless error.

[13-15] "[T]he improper admission of evidence is a 'trial' error and subject to harmless error review." *State v. Sorensen*, 283 Neb. 932, 938, 814 N.W.2d 371, 377 (2012). Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error. *State v. Pangborn*, 286 Neb. 363, 836 N.W.2d 790 (2013). Erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact. *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006).

In the pre-*Miranda* interrogation, Juranek said that (1) McBride threatened to kill Juranek, (2) Juranek stabbed McBride, and (3) Juranek would have stabbed McBride again but for the fact that McBride ran away. These three facts were proved by other admissible evidence. When Andersen first approached Juranek in the police cruiser, Juranek stated, "He threatened me so I stuck him." In the police cruiser, Juranek stated that he stabbed McBride once and "wanted to stick him again." And in the post-*Miranda* portion of the interrogation, Juranek said at least two times that McBride threatened to kill Juranek and that Juranek stabbed McBride. These statements were evidence that McBride threatened Juranek, that Juranek stabbed McBride, and that Juranek wanted to stab McBride again.

Other relevant evidence supported the district court's finding of guilt. One witness testified that she saw Juranek stab the other man, who was later identified as McBride, in the fight and chase McBride when he tried to get away. Also, the officer that arrived first at the scene of the stabbing testified that McBride identified his assailant as "Mike" and pointed to a man later identified as Juranek. In addition, after waiving his *Miranda* rights, Juranek confessed to seeking out

McBride with the explicit purpose of killing him and to stabbing McBride under the left rib cage.

The evidence that was properly admitted supported the district court's determination that Juranek was guilty of the crimes charged. Furthermore, the erroneously admitted statement by Juranek was cumulative of other evidence. As such, the admission of Juranek's confession obtained during the pre-*Miranda* interrogation was harmless error.

## 2. SUFFICIENCY OF EVIDENCE

Juranek assigns that there was insufficient evidence to convict him. He specifically argues that there was insufficient evidence to prove that his actions were premeditated and deliberate, because his actions "more appropriately fit into the definition of 'sudden quarrel manslaughter.'" Brief for appellant at 12.

When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. *State v. McGuire*, 286 Neb. 494, 837 N.W.2d 767 (2013).

Under Neb. Rev. Stat. § 28-303 (Reissue 2008), an element of first degree murder is that the act of killing was done "purposely and with deliberate and premeditated malice." Juranek claims that the evidence was insufficient to prove deliberate and premeditated malice. He does not argue that the evidence was insufficient as to any of the other elements of first degree murder.

The State adduced evidence that on September 14, 2011, Juranek learned for the first time that McBride had threatened to kill him. The State also presented evidence that in response to this knowledge, Juranek sought McBride out with the purpose of killing him. At least five times during the post-*Miranda* interrogation, Juranek explained that he was deliberately seeking out McBride with the intent to kill him. At one point,

Juranek said that on the day of the stabbing, he walked around until he found McBride. At another point, Juranek said, "If I had had a gun, I would have emptied the clip." This evidence was sufficient basis for a reasonable trier of fact to find beyond a reasonable doubt that Juranek killed McBride purposely and with deliberate and premeditated malice.

The State adduced sufficient evidence for a rational trier of fact to find that Juranek killed McBride purposely and with deliberate and premeditated malice. There was sufficient evidence to support Juranek's conviction for first degree murder. There was sufficient evidence to support a conviction for use of a deadly weapon to commit a felony.

## VI. CONCLUSION

For the reasons set forth, we affirm Juranek's convictions and sentences.

AFFIRMED.

HEAVICAN, C.J., participating on briefs.

HEAVICAN, C.J., concurring.

I concur in the decision of the court, which affirmed Juranek's convictions and sentences. But I write separately because I disagree with the majority's conclusion that Juranek's statement to the detective following the detective's question "Do you want to tell it to me?" should have been suppressed.

As is noted by the majority, in determining whether there is an interrogation for *Miranda* purposes, the question to ask is whether "'a reasonable and disinterested person [would] conclude that police conduct, directed to the suspect or defendant in custody, would likely elicit an incriminating response from that suspect or defendant.'"[1]

In this case, as was discussed in more detail by the majority, Juranek made certain statements while in the police cruiser on his way to the police station from the scene of his arrest. Those statements were incriminating. Upon arriving at the police station, a detective met Juranek and attempted to shake his hand. Juranek refused, indicating that his (i.e., Juranek's) hands were "dirty." The detective then told Juranek that he

---

[1] *State v. Bormann*, 279 Neb. 320, 327, 777 N.W.2d. 829, 836 (2010).

knew that Juranek had "shared" some information with the transporting officer. Juranek responded that he "told it to him 14 times." The detective responded, "Ok. Do you want to tell it to me?"

The detective testified that he was attempting to build a rapport with Juranek and did not intend to elicit an incriminating response from Juranek by asking this question. I reject the majority's conclusion that the detective "should have expected" that Juranek would confess again. In my view, the detective's actions were not inconsistent with rapport building. The detective attempted to shake Juranek's hand. He inquired of Juranek whether Juranek wanted to tell him what he told the other officer—at its root, a question requiring only a "yes" or "no" answer.[2] While I agree that ultimately the detective wanted to talk about the incriminating statements Juranek had made to Andersen and later in the cruiser, I do not agree that a "reasonable and disinterested person" would find that the detective was, in this moment, attempting to elicit an incriminating response from Juranek.

For this reason, I would conclude that Juranek's statement need not be suppressed.

---

[2] See, e.g., *State v. Eli*, 126 Haw. 510, 273 P.3d 1196 (2012); *State v. Riggs*, 987 P.2d 1281 (Utah App. 1999), *abrogated on other grounds, State v. Levin*, 144 P.3d 1096 (Utah 2006).