knew that Juranek had "shared" some information with the transporting officer. Juranek responded that he "told it to him 14 times." The detective responded, "Ok. Do you want to tell it to me?"

The detective testified that he was attempting to build a rapport with Juranek and did not intend to elicit an incriminating response from Juranek by asking this question. I reject the majority's conclusion that the detective "should have expected" that Juranek would confess again. In my view, the detective's actions were not inconsistent with rapport building. The detective attempted to shake Juranek's hand. He inquired of Juranek whether Juranek wanted to tell him what he told the other officer—at its root, a question requiring only a "yes" or "no" answer.[2] While I agree that ultimately the detective wanted to talk about the incriminating statements Juranek had made to Andersen and later in the cruiser, I do not agree that a "reasonable and disinterested person" would find that the detective was, in this moment, attempting to elicit an incriminating response from Juranek.

For this reason, I would conclude that Juranek's statement need not be suppressed.

─────────────

[2] See, e.g., *State v. Eli*, 126 Haw. 510, 273 P.3d 1196 (2012); *State v. Riggs*, 987 P.2d 1281 (Utah App. 1999), *abrogated on other grounds, State v. Levin*, 144 P.3d 1096 (Utah 2006).

─────────────

State of Nebraska, appellee, v.
Susan M. DeJong, appellant.
___ N.W.2d ___

Filed April 11, 2014.    No. S-12-432.

1. **Motions to Suppress: Confessions: Constitutional Law: Miranda Rights: Appeal and Error.** In reviewing a motion to suppress a statement based on its claimed involuntariness, including claims that law enforcement procured it by violating the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts

meet constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination.

2. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

3. **Evidence.** Determining the relevancy of evidence is a matter entrusted to the discretion of the trial court.

4. **Rules of Evidence: Other Acts: Appeal and Error.** It is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under Neb. Evid. R. 403 and 404(2), Neb. Rev. Stat. §§ 27-403 (Reissue 2008) and 27-404(2) (Cum. Supp. 2012), and the trial court's decision will not be reversed on appeal absent an abuse of discretion.

5. **Miranda Rights.** *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), adopted a set of prophylactic measures to protect suspects from modern custodial interrogation techniques. The safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.

6. **Self-Incrimination: Right to Counsel.** If the suspect indicates that he or she wishes to remain silent or that he or she wants an attorney, the interrogation must cease.

7. **Right to Counsel.** When a suspect invokes his or her right to counsel, the suspect must not be subject to further interrogation by the authorities until counsel has been made available to him or her, unless the accused initiates further communication, exchanges, or conversations with the police.

8. **Confessions.** Voluntary confessions are not merely a proper element in law enforcement, they are an unmitigated good, essential to society's compelling interest in finding, convicting, and punishing those who violate the law.

9. **Constitutional Law: Confessions.** Volunteered statements of any kind are not barred by the Fifth Amendment, and their admissibility is not affected by the holding in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

10. **Criminal Law: Self-Incrimination: Appeal and Error.** In considering whether a suspect has clearly invoked the right to remain silent, an appellate court reviews not only the words of the criminal defendant, but also the context of the invocation.

11. **Self-Incrimination: Police Officers and Sheriffs.** Relevant circumstances in determining whether a suspect has clearly invoked the right to remain silent include the words spoken by the defendant and the interrogating officer, the officer's response to the suspect's words, the speech patterns of the suspect, the content of the interrogation, the demeanor and tone of the interrogating officer, the suspect's behavior during questioning, the point at which the suspect allegedly invoked the right to remain silent, and who was present during the interrogation. A court might also consider the questions that drew the statement, as well as the officer's response to the statement.

12. **Trial: Evidence: Confessions: Appeal and Error.** The admission of an improperly obtained statement is a trial error, and so its erroneous admission is subject to harmless error analysis.

13. **Trial: Evidence: Appeal and Error.** To conduct harmless error review, an appellate court looks to the entire record and views the erroneously admitted evidence relative to the rest of the untainted, relevant evidence of guilt.

14. **Verdicts: Appeal and Error.** Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error.

15. **Trial: Evidence: Appeal and Error.** Erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact.

16. **Constitutional Law: Confessions: Waiver.** The fact that a defendant has shared a secret in an inadmissible statement does not preclude the defendant from later waiving his or her constitutional rights after the conditions that induced the original statement have been removed.

17. **Confessions: Police Officers and Sheriffs: Evidence.** For a subsequent confession made after an inadmissible confession, a court focuses on the voluntariness of any subsequent statement. The court should evaluate the entire course of police conduct and the surrounding circumstances, including whether or not the conditions that made the first statement inadmissible had been removed.

18. **Miranda Rights: Confessions: Waiver.** A subsequent confession made after an inadmissible confession can be admissible if curative measures are undertaken to ensure that a reasonable person in the suspect's situation would understand the import and effect of the warning and waiver under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Appeal from the District Court for Jefferson County: PAUL W. KORSLUND, Judge. Affirmed.

James R. Mowbray and Jeffery Pickens, of Nebraska Commission on Public Advocacy, for appellant.

Jon Bruning, Attorney General, and James D. Smith for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, STEPHAN, McCORMACK, MILLER-LERMAN, and CASSEL, JJ.

McCORMACK, J.
## NATURE OF CASE
Susan M. DeJong was convicted of first degree murder and use of a deadly weapon to commit a felony for the death of

her husband, Thomas DeJong (Tom). Although Susan raises several issues, the primary issue presented is whether Susan's statements made after 4:18 a.m. on March 12, 2011, while in police custody, are admissible as volunteered statements. We conclude that the statements made after 4:18 a.m. by Susan were voluntary and were not required to be suppressed under U.S. Supreme Court precedent.

## BACKGROUND

On March 11, 2011, Susan called the 911 emergency dispatch service at approximately 4 p.m. Susan told the operator that her husband, Tom, was not breathing and was cold to the touch. Susan stated that Tom had gone to South Dakota to be with his "whore" and came home "all . . . beat up." The operator had Susan perform cardiopulmonary resuscitation on Tom until the emergency units arrived.

When emergency personnel arrived at the DeJong home, Susan was hysterical and she repeatedly stated that the "whore" had done this to Tom. Emergency personnel immediately began resuscitation efforts. Tom was not breathing, and there was no heartbeat. Dried blood was around his nostrils and the top of his mouth. His hands, arms, feet, legs, torso, and head were visibly scratched, cut, and deeply bruised. Emergency personnel were able to help Tom regain a heartbeat.

Tom was taken to the Jefferson Community Health Center and was later transported by ambulance to Bryan Health, west campus trauma center, in Lincoln, Nebraska (Bryan hospital). Laboratory reports and blood tests indicated a threat of imminent heart and renal failure. A chest x ray indicated multiple rib-sided fractures and a partially collapsed lung. A CAT scan revealed the following injuries: a swollen brain; a tremendous amount of fractures within the chest cavity, including the spine, the ribs, and the scapula; a comminuted fracture of the nose; and a possible fracture of the hyoid bone in the neck.

The treating physicians concluded that Tom would not be able to recover from the injuries. The physicians asked Susan for permission to remove Tom from life support, and she granted the request. Tom passed away shortly thereafter.

Susan's Statements
at Hospitals

At the Jefferson Community Health Center, Rebecca McClure, a nurse, stayed with Susan while waiting for Tom's prognosis. The two of them waited in a small quiet room located outside of the emergency room.

Susan told McClure that she had not seen Tom since Wednesday and that he came home that Friday morning. She stated that Tom was "stumbling around in the house" and that the noise woke her up. Tom had been beaten, was cold, and quickly became unresponsive. Susan told McClure that Tom had spent the past days visiting the "whore" in South Dakota. According to Susan, the "whore" would beat Tom with tie-down straps from Tom's semi-truck. Susan also stated that the "whore" and Tom were trying to kill her by giving her a sexually transmitted disease (STD). McClure personally drove Susan home after Tom was transported to Lincoln, and Susan then drove herself to Bryan hospital in Lincoln.

Investigator Wendy Ground from the Lincoln Police Department arrived at Bryan hospital at approximately 10:20 p.m. Ground questioned Susan about Tom's injuries. Susan told Ground that Tom had returned home that morning. He looked pale, and he had stated that he did not feel well. Susan told Ground that Tom was apologetic and that he had told her he had made a mistake. According to Susan, Tom said his alleged mistress did not love him and that the mistress went "psycho" and wanted to kill him. Susan told Ground that the mistress had previously tried to kill Susan by cutting her vehicle's brake lines.

Ground asked Susan about Tom's medical history. Susan stated that Tom had been feeling weak and clumsy for the past 2½ years. Susan stated that he was diagnosed with an STD 1½ years ago. Susan also explained that the current cut on Tom's lip was caused by a pipe when Tom was working with a cow.

After Tom had been declared dead, Ground asked Susan if she was willing to go to the police headquarters for an interview. Susan agreed.

Interrogation of Susan at
Police Headquarters

After arriving at the police headquarters at approximately
1 a.m., Ground placed Susan in an interview room. Ground
left the room, and Susan began working on her written state-
ment. Susan was left alone in the interview room from 1:12 to
3:04 a.m.

At approximately 3:04 a.m., Ground reentered the interview
room. At 3:08 a.m., Ground read Susan her *Miranda* rights and
Susan told Ground that she understood her rights. Susan pro-
ceeded to sign the *Miranda* waiver.

Ground began the interrogation by asking general questions
about Tom's injuries and his whereabouts for the week. Susan
repeated the facts as she had stated at Bryan hospital.

Susan stated Tom went to Seward, Nebraska, on Monday,
March 7, 2011, for a job application and from there he went
directly to South Dakota. Susan told Ground that she had
talked to him on her cell phone on Monday, March 7, for
approximately 44 minutes. According to Susan, Tom indicated
that he wanted to be with "that thing." On March 8, Susan
and Tom talked for 5 minutes, and Susan told Ground that she
likely screamed at him because she was not happy.

At approximately 3:22 a.m., Susan told Ground that she was
exhausted. But she continued to talk. Susan explained that the
next time she heard from Tom was on Friday morning. She
again repeated the same story of what had occurred that day.
At approximately 3:34 a.m., Susan stated that she needed some
sleep because she was exhausted.

The questioning continued, and Susan stated that she had
confronted Tom when he came home on Friday morning
because she was angry. Susan told Ground that she cannot say
for sure that Tom drove home and that she does not know how
he could have driven in his condition.

At approximately 3:41 a.m., Investigator Robert Farber
entered the room and silently sat at the table. At 3:42 a.m.,
Susan began crying, and at 3:43 a.m., she stated, "I'm
tired. I wanna go to bed, please. I'm done, I wanna go to
sleep. I'm tired." Farber immediately interrupted her and

introduced himself. Farber then told Susan that he had "a couple questions."

Farber began questioning. He asked Susan when Tom and she were married and whether they have common children. Farber questioned Susan about her relationship with Tom and about Tom's alleged relationship with his mistress. The questions became more directed and intense as Farber continued the interrogation.

In response to the questioning, Susan stated that everybody called Tom a "wheeney" and that he took the beatings from his alleged mistress. Susan also stated that Tom had slapped her in Minnesota. Susan explained that she was arrested for that incident because she decided to not tell the police that Tom had slapped her.

At approximately 4 a.m., Susan again stated, "I'm getting tired, I'm done, I'm tired." Farber interjected again before Susan completed the statement. Farber asked Susan if she had anything do with the injuries. Susan answered no; Farber continued to ask questions, and Susan continued to answer. For the next 18 minutes, the questions from Farber became more pointed and directed.

At 4:18 a.m., Susan exclaimed, "I want a lawyer, please. I'm tired of this." "I will talk [to] them and they, I want some sleep, please." "I didn't, I will, I just wanted to live and I loved him so much, and I just wanted to live and he wanted a divorce, and I just wanted to live with him. . . . I loved him." Farber said "okay" and left the room almost immediately. Ground followed.

Susan laid her head down at the table for approximately 30 seconds, stood, and grabbed her keys to leave. Susan opened the door to the interview room and asked to have a cigarette. Ground told her to take a seat. Susan turned around and mumbled, "So sorry. I'm sorry." Ground apparently paused to hear what Susan said and then reentered. Ground silently took a seat at the table in the same spot she sat during the entire interrogation.

Susan talked uninterrupted for nearly 8 minutes with a slow delivery, while Ground sat and listened. Susan stated:

So sorry. I'm sorry. (inaudible) beat by that whore. He used to come home, bruises, bloody nose, black eyes. He's got scars on his back that are not from me. He's got marks on him that are not from me. He'd come home and, well, he'd tell his boss (inaudible) on the trip. He'd tell me he did it on the truck going to (inaudible). Then he'd turn around, go to Sioux Falls and that Gloria. Oren called me today and asked if I'd seen your face. It's all bruised up. I told him that fuckin' cunt you're married to did it. (inaudible) I didn't ever touch him. Didn't ever touch him. When I slapped him in Fairbury, not Fairbury, in (inaudible), what the name of that town? I can't think of it, Burger King, God. The car pulls in there, parked, to get a burger but on the way in is when he finally admitted he'd been sleeping with that thing. Finally admitted it. He got our money, went into Burger King. I got out of the truck and proceeded to walk across the highway to the other little truck stop across the road and he followed me over there. Came up to me, grabbed one of the dogs and I picked my leg up. Leave it alone. And then I proceeded, I walked, was walking, trying to call my son to come get me but he wouldn't answer his stupid phone. Standing there at the back, I'm like I'm going home. I'm going home. Well, fine, I'll take you home. I don't know. I'm going home. That's when he shoved me into the wall and cracked me in the jaw. And I slapped him. Some kid walked out of Burger King. So I'm yowling so he called the cops. Next thing I know they're showing up. He said I'll take you home, I'll take you home. Fine, I'll take you home. Fine, I'll take you home. Then we got in the truck. Next thing I know there's the cops. Everybody thinks Tom is such an innocent man. He used to be. He used to be the most loving, gentle, sweet man you could meet. Till he met that (inaudible). Then they started molesting children. I still say I think he was on drugs. Cuz you don't drive 14, 16 hours with nothing. My Blazer for one hasn't ever had a problem with the brakes. I hit a deer. Well, come to find

out my front brakes are disconnected. Huh. Excuse me. I don't know. I just know that (inaudible) no more getting shoved. (inaudible) I didn't poison him. He is what he is from what he plays with. (inaudible) He told me he was going to kill me. (inaudible) kill me. (inaudible) Am I under arrest?

Ground told Susan that the decision for arrest was up to the police department in Fairbury, Nebraska. Ground answered some questions from Susan, but did not ask Susan any questions.

Susan continued:

Self-defense, because I don't bruise and he does. That's pretty much the way that goes. (inaudible) she did (inaudible) to him. For what she did to him. He wasn't the man I married. What I told you about it is all true. It does deal drugs, (inaudible) drugs, go psycho. And it went psycho on him more than once. Does molest children. Little boy's name's Chris. . . . I have to be arraigned within 24 hours. I know that, why not. Just like the deal in Minnesota. And he'll walk away scott free. And there's a lot of the injuries he had [that were] not from me. The worse one he get that I can remember is falling off the ladder. That one scared me. Why didn't I just leave. Why didn't I just run. Because he always showed up. He always showed up. (inaudible) I need some sleep. (inaudible) so tired. I just, I just need somebody to talk for me right now, I'm so tired. I'm too tried. I haven't (inaudible) for two days. Could you? I want a cigarette.

Ground responded: "Okay, just be patient with us." Susan continued:

No, I want a cigarette. I want a cigarette. Then He did take off and go back to S.D. (inaudible) either. It's all partly true. The whole story is partly true. I don't know. He came back beaten up from S.D. too. I didn't hit him in the head. (inaudible) when he fell on it. I stepped on it. That was after he threw it at me is how it ended up there. I'm not under arrest. I can go outside and have a cigarette if I want.

After a back and forth conversation between Susan and Ground, Susan stated, without being questioned:

> (inaudible) you'll arrest me because that's the way it always goes. Let's (inaudible) her and she's the one that always gets in trouble. (inaudible) self defense, self preservation. They made sure of it. It takes a heck of a hit for me to bruise but . . . make sure that and Tom knew it.

Shortly thereafter, an unidentified female officer entered the room. Ground and the female officer took pictures of Susan's bruised hands and forearms. The interrogation video ends. Susan was subsequently arrested and charged with first degree murder and use of a deadly weapon to commit a felony.

## Hearing on Motion to Suppress Interrogation

On June 13, 2011, Susan filed a motion to suppress her statements given on March 12, which she argued were obtained in violation of her constitutional rights. Susan argued that there were three different statements made by her that invoked her constitutional right to end the interrogation. At 3:43 a.m., Susan stated, "I'm done, I wanna go to sleep. I'm tired." At 4 a.m., Susan stated, "I'm getting tired, I'm done, I'm tired." And the last relevant statement was made at 4:18 a.m., when Susan stated, "I want a lawyer, please. I'm tired of this."

At the hearing, the district court accepted a joint stipulation that Susan was in custody at the time of the interrogation.

In its order, the district court found Susan's first two statements were not unequivocal and unambiguous statements that she wanted to cut off the questioning. Additionally, the court found that all of the statements made by Susan after exercising her right to counsel were voluntarily made and were not the result of the functional equivalent of interrogation.

Susan filed a motion to reconsider. Upon reconsideration, the district court suppressed the statements made from 4 to 4:18 a.m., because her statement that she was "done" was unequivocal and unambiguous. However, statements made before 4 a.m. were admissible, because Susan had not

yet invoked her right to end questioning. The district court found that statements made after 4:18 a.m. were admissible, because they were not the result of questioning or the functional equivalent.

Rule 404 Hearing

On January 26, 2012, the State filed an "Amended Motion to Conduct Hearing Pursuant to Neb. Rev. Stat. § 27-104 Regarding the Admissibility of § 27-404(2) Evidence."[1] A hearing was held on the same date (rule 404 hearing), and evidence was accepted. There are three prior "bad acts" that the State wanted admitted for limited purposes.

For the first prior "bad act," the State offered the testimony of then-police officer Nicholas Schwalbe of Jackson, Minnesota. Schwalbe testified that on May 31, 2010, he received a call of a fight in progress at a truckstop. He identified the driver as Tom and the passenger as Susan. Schwalbe observed that Tom had a black eye, a fresh wound under that eye, and scabbing on his face, ear, and neck, as well as spots of fresh blood rolling down his neck. Susan was placed under arrest. Susan told Schwalbe that they were fighting because Tom was cheating on her.

The second event occurred in August 2010. James Platt, Susan's son, and Sharon Platt, James' wife, testified that Susan and Tom unexpectedly came to live with them that August. Susan told them that she and Tom needed to get away from their home, which was in South Dakota at the time. Both James and Sharon testified that Tom was "in bad shape." Tom's face was beaten and swollen, and he had bloody ears. When asked, Susan told James that the injuries were caused by a truckstop robbery. James testified that Susan had for years believed Tom was unfaithful with someone from work. Shortly thereafter, James testified that Susan and Tom moved to Jefferson County, Nebraska.

The third event occurred in late 2010. James and Sharon visited Susan and Tom at their new home in Jefferson County.

---

[1] See Neb. Evid. R. 104 and 404(2), Neb. Rev. Stat. §§ 27-104 (Reissue 2008) and 27-404(2) (Cum. Supp. 2012).

Both testified that Tom looked "'terrible.'" He had cuts on his face and a split lip. Sharon asked Tom about his facial injuries, and Susan replied for Tom that the injuries happened at work when "the pigs got him."

At the hearing, the State also offered the testimony of McClure, Brian Bauer, and Ground. McClure testified about Susan's story that Tom had gone to South Dakota "probably up visiting his girlfriend." She testified about what Susan had told her at the hospital.

Bauer, who had employed Tom on his farm in Jefferson County, testified that Tom would come to work every 2 to 3 weeks visibly sore with bruises on his face, black eyes, split lips, and marks on his hands. According to Bauer, these injuries did not occur at work.

Ground testified that at the hospital, Susan stated that Tom's facial injuries and split lip were caused by working on the farm. Susan told her that the split lip was caused by a pipe when Tom was working with a cow.

Based on the evidence presented, the district court found that the May 31, 2010, incident in Minnesota was admissible as it pertains to the injuries observed on Tom and to Susan's statement as to the reason for their altercation, for the specific and limited purposes of demonstrating the existence of motive and intent. The district court further ordered that all three incidents were admissible for the specific and limited purposes of negating, or demonstrating the existence of, intent, identity of the perpetrator, and absence of mistake or accident.

## Trial

A jury trial was held on February 21, 2012. The State offered the testimony of the 911 dispatcher, the responding emergency personnel, the investigating officers, Farber, Ground, McClure, Bauer, Schwalbe, and James and Sharon. The State offered the video interrogation of Susan at the police headquarters, with the footage from 4 to 4:18 a.m. redacted. The three prior bad acts that were the subject of the rule 404 hearing were also presented to the jury. In addition, the following evidence was presented.

EVIDENCE FOUND AT HOME

The DeJong home was searched on March 12, 2011. Tom's Chevrolet Blazer was parked in the detached garage. No evidence was found in the garage or either in or on the Blazer. Susan's white pickup truck was processed on March 15. Tom's blood was found on the hood and fender of the truck. Inside the pickup truck, there was a red duffelbag and a blue denim bag.

In the red bag, investigators found women's clothing, a yellow hammer, a blue hammer, toiletry items, men's pajamas, and Tom's wallet. The blue bag contained a computer, a lug wrench, and a cell phone.

DNA tests were conducted on this evidence, and results showed that the blue hammer had a mixture of Tom's and Susan's DNA. Susan's DNA was found on the handle of the yellow hammer, and a mixture of DNA was found in a blood sample on the claw area of the yellow hammer. Tom was the major contributor of that DNA. Tom's DNA was found in the bloodstains on the men's pajamas.

In the house, at least 70 blood drops were found throughout. No large pools of blood were found. Blood was found in the living room, kitchen, bathroom, dining room, and the master bedroom. Blood was also found on clothing items seized from the laundry room. A forensic scientist testified to which stains were left by Tom, by Susan, or by a mixture of the two. Tom's DNA was found repeatedly in the bloodstains throughout the house.

MEDICAL TESTIMONY

Dr. Craig Shumard was working in the emergency room when Tom was brought by ambulance to the Jefferson Community Health Center. Shumard described Tom's injuries to the jury and testified that the injuries did not arise from natural causes or accidents. He testified that Tom's injuries were inconsistent with typical farmwork injuries.

Dr. Stanley Okosun, a trauma surgeon at Bryan hospital, testified to his treatment and care of Tom. Okosun testified that Tom's high levels of myoglobin indicated that the trauma inflicted on Tom occurred 12 to 24 hours prior to his arrival

at Bryan hospital. Okosun testified that Susan told him that Tom's bruising was caused by working on a pig farm. Okosun testified that the explanation was highly unlikely. He further testified that with the injuries suffered, Tom could not have driven home on the Friday morning before his death. According to Okosun, Tom's injuries could not have been caused by natural causes or a car accident. He attributed Tom's injuries to blunt force trauma caused by an assault.

Dr. Juris Purins was the radiologist who reviewed the CAT scan performed on Tom at Bryan hospital. The CAT scan revealed unusually severe head and brain injuries which are typically associated with a patient's not breathing. Tom's nose had a comminuted fracture, which means it was fractured in multiple places. Tom had a dislocation of the lens in his right eye, which was another unusual injury. Purins described a tremendous number of fractures within the chest cavity, including the spine, ribs, and scapula. One of the fractures was an old injury but the rest were recent. Purins also identified a fracture of the hyoid bone in the neck. Purins testified that the fractured hyoid bone, along with subcutaneous emphysema, indicated a potential choking injury. Purins opined that the injuries were the result of a "pretty severe beating," maybe from a hammer, and that the injuries would have prevented Tom from driving or walking.

Dr. Jean Thomsen was the pathologist who performed Tom's autopsy. Thomsen stated that she had "never seen someone so extensively injured." After the autopsy, Thomsen found the cause of death to be "[b]lunt force trauma to the head, neck, chest and extremities." In her opinion, Tom's death was a homicide.

In her autopsy report, Thomsen found defects on Tom's hands and arms that she described as defensive wounds. Thomsen found that the injuries were caused by some type of instrument. Thomsen testified that the injuries were C-shaped and semicircular and may have been caused by a hammer. The autopsy also confirmed a fracture of the hyoid bone in the neck, but she did not find other signs usually associated with manual strangulation beyond neck bruising.

Defense counsel offered the expert testimony of Dr. Robert Bux, a forensic pathologist. Bux agrees that this case was a homicide caused by multiple instances of blunt force trauma. He stated that he has "never personally seen a case like this with so much soft tissue contusion." Tom was "really beaten." Bux opined that the injuries occurred at least 24 hours prior to death, and maybe as many as 36 hours prior. He agrees that the wounds on Tom's hands and arms indicate that Tom was attempting to ward off an attack.

Bux disagreed that a clawhammer was used, because there were no circle bruises from the hammerhead, no raking marks from the claw, and no pattern of contusions consistent with the side of a hammer. He opined that based on a lack of hemorrhaging around the hyoid bone, the bone had been fractured during the autopsy. He argued that the brain injuries were caused not by the blunt force trauma but by Tom's not breathing while still at home. Bux also testified that Tom would have been able to walk and talk immediately after the beating he suffered, but that his condition would have continued to deteriorate. Bux also opined that because of the relatively small amounts of blood found in the home, the assaults that caused Tom's facial injuries likely did not occur in the home.

### INSTANT MESSENGER CHATS

An investigator seized Susan's computer and found relevant Internet instant messenger chats. James, Susan's son, confirmed the messages were sent to him from Susan under her handle "the_piglady." On September 24, 2010, the "the_piglady" wrote in reference to Tom, "i can't do this . . . staying here anymore," "i've come to realize i literally hate him." She continued, "now i wish he was dead . . . i really hate him more than i have ever hated ANYONE." On February 14, "the_piglady" wrote that "i'm looking at getting rid of tom" and "i can't take or do this anymore."

### TOM'S WHEREABOUTS
### WEEK OF HIS DEATH

Beyond testifying about Tom's injuries while working at the farm, Bauer testified that on the Tuesday before his death,

Tom worked a full day. Tom was bruised and had trouble getting around. On Wednesday and Thursday, Tom called in sick. On Thursday, Bauer drove by the house and noticed that both vehicles owned by the DeJongs were at the house, including Tom's Blazer.

James testified that he had a telephone conversation with Susan on the Thursday morning before Tom's death. James asked Susan what size tires were on Susan's white pickup truck. James testified that Susan asked someone else in the house. James assumed that the person was Tom and was surprised that Tom was not working. James testified that Susan did not mention in that telephone call that Tom was in South Dakota.

Cell phone records were also introduced into evidence. On March 8, 2011, the Tuesday before Tom's death, there were four calls from Susan's cell phone to Tom's cell phone and the calls "hit" or "pinged" off the nearby cell towers in the Fairbury and Hebron, Nebraska, areas. On Wednesday and Thursday, there were calls from Tom's cell phone to Bauer's cell phone. Both calls "hit" off cell towers in the Fairbury and Hebron areas.

## Alleged Mistress

The woman who Susan alleged was Tom's mistress also testified at trial. The woman worked as a dispatcher for a small trucking company in South Dakota. Tom had been a truckdriver for that company. The woman testified that she and Tom had a working relationship only. She never spent time with Tom socially. She never had any type of sexual contact with Tom. She testified that she had no reason to want to hurt Tom or Susan. The woman testified that from March 8 to 11, 2011, she was on a trip to Minnesota and had no contact with Tom. She testified that she did not inflict Tom's injuries.

## Convictions and Sentences

After deliberation, the jury found Susan guilty on count I, murder in the first degree, and guilty on count II, use of a deadly weapon to commit a felony. Susan was sentenced to

life imprisonment for count I and 50 to 50 years' imprisonment on count II, to be served consecutively. Susan now appeals.

## ASSIGNMENTS OF ERROR

Susan assigns, restated and summarized, that the district court erred by (1) admitting at trial the statements she made to investigators between 3:43 to 4 a.m.; (2) admitting at trial the statements she made to investigators after 4:18 a.m.; (3) admitting at trial evidence of Tom's injuries on prior occasions and her related statements concerning the injuries, because there was no clear and convincing evidence that she had committed a crime, wrong, or act with respect to those injuries; and (4) admitting at trial evidence of Tom's injuries on prior occasions and her related statements concerning the injuries, because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.

## STANDARD OF REVIEW

[1] In reviewing a motion to suppress a statement based on its claimed involuntariness, including claims that law enforcement procured it by violating the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*,[2] we apply a two-part standard of review. Regarding historical facts, we review the trial court's findings for clear error. Whether those facts meet constitutional standards, however, is a question of law, which we review independently of the trial court's determination.[3]

[2-4] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[4] Determining the relevancy of evidence is a matter entrusted to the discretion of the trial court.[5] Likewise, it is

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] *State v. Bauldwin*, 283 Neb. 678, 811 N.W.2d 267 (2012).

[4] *State v. Ely, ante* p. 147, 841 N.W.2d 216 (2014).

[5] *Id.*

within the discretion of the trial court to determine relevancy
and admissibility of evidence of other wrongs or acts under
Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2008),
and rule 404(2), and the trial court's decision will not be
reversed on appeal absent an abuse of discretion.[6]

## ANALYSIS

### INTERROGATION

Susan argues that the district court erred in not suppressing
her statements made from 3:43 to 4 a.m. and her statements
made after 4:18 a.m. She argues that the statements were
obtained in violation of her *Miranda* rights.

[5,6] The *Miranda* Court adopted a set of prophylactic
measures to protect suspects from modern custodial interroga-
tion techniques.[7] The safeguards come into play whenever a
person in custody is subjected to either express questioning or
its functional equivalent.[8] The safeguards include the familiar
*Miranda* advisements of the right to remain silent and the right
to have an attorney present at questioning.[9] If the suspect indi-
cates that he or she wishes to remain silent or that he or she
wants an attorney, the interrogation must cease.[10]

[7] In *Edwards v. Arizona*,[11] the U.S. Supreme Court held
that not only must the interrogation cease when a suspect
invokes his or her right to counsel but also that the suspect
"is not subject to further interrogation by the authorities until
counsel has been made available to him, unless the accused
himself initiates further communication, exchanges, or con-
versations with the police." This second layer of protections
ensures that police will not take advantage of the coercive
pressures inherent in custodial interrogation by repeatedly

---

[6] *Id.*

[7] See *Miranda v. Arizona, supra* note 2.

[8] *State v. Bormann*, 279 Neb. 320, 777 N.W.2d 829 (2010).

[9] See *Miranda v. Arizona, supra* note 2.

[10] *Id.*

[11] *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 68 L. Ed. 2d
378 (1981).

questioning a suspect, who has requested counsel, until the suspect submits to questioning.[12] It ensures that the suspect was not pressured by the police to change his mind on his invocation for counsel.[13]

*Edwards* is inapplicable if the suspect initiated the post-invocation discussion with the authorities.[14] As the *Edwards* Court explained:

> [W]e do not hold or imply that [the suspect] was powerless to countermand his election or that the authorities could in no event use any incriminating statements made by [him] prior to his having access to counsel. Had [the suspect] initiated the meeting . . . nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial. The Fifth Amendment right identified in *Miranda* is the right to have counsel present at any custodial interrogation. Absent such interrogation, there would have been no infringement of the right that [the suspect] invoked and there would be no occasion to determine whether there had been a valid waiver. *Rhode Island v. Innis*,[15] makes this sufficiently clear.[16]

[8,9] The *Edwards* rationale recognizes the value of voluntary statements. "Voluntary confessions are not merely 'a proper element in law enforcement,' . . . they are an 'unmitigated good,' . . . '"essential to society's compelling interest in finding, convicting, and punishing those who violate the law."' . . ."[17] Thus, "[v]olunteered statements of any kind are

---

[12] See *Maryland v. Shatzer*, 559 U.S. 98, 130 S. Ct. 1213, 175 L. Ed. 2d 1045 (2010).

[13] *Dorsey v. U.S.*, 60 A.3d 1171 (D.C. 2013).

[14] See, e.g., *Minnick v. Mississippi*, 498 U.S. 146, 111 S. Ct. 486, 112 L. Ed. 2d 489 (1990); *Arizona v. Roberson*, 486 U.S. 675, 108 S. Ct. 2093, 100 L. Ed. 2d 704 (1988); *Edwards v. Arizona, supra* note 11.

[15] *Rhode Island v. Innis*, 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980).

[16] *Edwards v. Arizona, supra* note 11, 451 U.S. at 485-86.

[17] *Maryland v. Shatzer, supra* note 12, 559 U.S. at 108 (citations omitted).

not barred by the Fifth Amendment and their admissibility is not affected by our holding [in *Miranda*]."[18]

## Statements Made Between
## 3:43 to 4 a.m.

Susan argues that her statements from 3:43 to 4 a.m. should have been suppressed, because she unambiguously invoked her right to cut off questioning. We agree with Susan that her statements from 3:43 to 4 a.m. should have been suppressed, but conclude that the district court's error was harmless.

As mentioned, the safeguards of *Miranda* "'assure that the individual's right to choose between speech and silence remains unfettered throughout the interrogation process.'"[19] The suspect has the right to "control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation."[20]

[10,11] In considering whether a suspect has clearly invoked the right to remain silent, we review not only the words of the criminal defendant, but also the context of the invocation.[21] Relevant circumstances include the words spoken by the defendant and the interrogating officer, the officer's response to the suspect's words, the speech patterns of the suspect, the content of the interrogation, the demeanor and tone of the interrogating officer, the suspect's behavior during questioning, the point at which the suspect allegedly invoked the right to remain silent, and who was present during the interrogation.[22] A court might also consider the questions that drew the statement, as well as the officer's response to the statement.[23]

---

[18] *Miranda v. Arizona, supra* note 2, 384 U.S. at 478.

[19] *Connecticut v. Barrett*, 479 U.S. 523, 528, 107 S. Ct. 828, 93 L. Ed. 2d 920 (1987) (emphasis omitted) (quoting *Miranda v. Arizona, supra* note 2).

[20] *Michigan v. Mosley*, 423 U.S. 96, 103-04, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975).

[21] *State v. Rogers*, 277 Neb. 37, 760 N.W.2d 35 (2009).

[22] *Id*.

[23] *Id*.

We find that a reasonable officer presented with the circumstances of this interrogation would have understood Susan's statements at 3:43 a.m. that she was done, tired, and wanted to go to sleep as an invocation of her right to remain silent. We have held very similar statements, such as "'I'm done,'" to be unambiguous invocations.[24] Not only should a reasonable officer have understood Susan's statement to be an invocation of the right to remain silent, it appears that Farber understood the statement this way. After the invocation, Farber interrupted Susan and began to ask questions for his coroner's report. Farber's actions indicate an understanding that Susan was done talking about the investigation. But, after changing the topic of conversation briefly, Farber continued the interrogation. *Miranda* prohibits officers from simply persisting after a suspect invokes his or her right to remain silent.[25]

[12] Therefore, the district court's failure to suppress Susan's statements from 3:43 to 4 a.m. was a constitutional error.[26] But even constitutional error does not automatically require reversal of a conviction if that error was a trial error and not a structural defect.[27] The admission of an improperly obtained statement is a trial error, and so its erroneous admission is subject to harmless error analysis.[28]

[13,14] To conduct harmless error review, we look to the entire record and view the erroneously admitted evidence relative to the rest of the untainted, relevant evidence of guilt.[29] Our review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict

---

[24] *Id*. at 69, 760 N.W.2d at 61.

[25] *State v. Rogers, supra* note 21.

[26] See *State v. Bauldwin, supra* note 3.

[27] See, *Arizona v. Fulminante*, 499 U.S. 279, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991); *State v. Bauldwin, supra* note 3.

[28] *Id*.

[29] See *State v. Freemont*, 284 Neb. 179, 817 N.W.2d 277 (2012).

rendered in the questioned trial was surely unattributable to the error.[30]

We begin by finding that the untainted, relevant evidence strongly supports Susan's guilt. Overwhelming evidence of guilt alone is not sufficient to find harmless error, but it is relevant in determining whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error.[31] The State's evidence demonstrated that Susan's story that Tom was beaten by his alleged mistress was completely fabricated. The evidence presented at trial showed that Tom was home that week and never left for South Dakota.

Bauer, Tom's boss, testified that Susan's and Tom's vehicles were at the DeJong home the day before Tom allegedly returned from South Dakota. Bauer testified that Tom had called in sick to work on that Wednesday and Thursday. Cell phone records confirm that those calls "pinged" off cell towers near the DeJong home and not in South Dakota. Susan's son, James, testified that he believed Tom was at the DeJong home on Thursday because of a telephone conversation he had with Susan that day. At trial, Susan presented no evidence that Tom had actually gone to South Dakota. Additionally, the alleged mistress testified that she and Tom never had an extramarital relationship, that Tom did not visit her that week, and that she did not cause his injuries.

Other evidence demonstrates Susan's motive for killing Tom. During her hospital interview, Susan ranted about Tom and his "whore." Susan alleged that Tom and that "whore" used drugs and molested children. Susan blamed the "whore" for ruining her relationship with Tom. Additionally, the State introduced Susan's Internet instant messages in which Susan stated that she "hate[d]" Tom, that she wished he were dead, and that she was "looking at getting rid of" him.

The evidence at trial also showed that Susan may have been the only person with the opportunity to inflict Tom's injuries. The medical testimony offered at trial established that many of Tom's injuries were inflicted well within 72 hours of his

---

[30] *State v. Bauldwin, supra* note 3.

[31] *Id.*

death. That indicates that Tom's injuries may have occurred any time after Tuesday. The evidence indicates that during those periods of time, Tom was at home with Susan. There was no evidence presented, other than Susan's fabricated statements about South Dakota, that Tom left the home on Wednesday, Thursday, or Friday. There was no evidence presented that someone other than Susan had spent time with Tom after Tuesday.

The physical evidence also supported Susan's guilt. All of the medical experts testified that Tom was severely assaulted and that his injuries were not caused naturally or by accident. His death was caused by blunt force trauma. Tom had defensive wounds on his hands and arms. Droplets of blood were found throughout the house, including on Susan's clothes. A red bag containing women's clothes, men's pajamas, Tom's wallet, and two hammers and a blue bag containing a computer, a lug wrench, and a cell phone were found in Susan's truck. Thomsen, the pathologist who performed Tom's autopsy, testified that the injuries to Tom's body were caused by some type of instrument and that the instrument could have been a hammer. After the interrogation, photographs and testimony established that Susan had bruises and sores on her palms that would be consistent with swinging a hammer. The bloodstained blue hammer recovered in Susan's truck had a mixture of Tom's and Susan's DNA. Susan's DNA was found on the handle. Tom's DNA was found on the head of the hammer.

[15] Again, overwhelming evidence of guilt alone does not establish harmless error.[32] However, the erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact.[33]

After reviewing the interrogation, we find that the statements made by Susan from 3:43 to 4 a.m. are almost entirely cumulative to her properly admitted statements made to Ground at Bryan hospital just 5 hours prior to being interrogated. Susan

_____

[32] *Id.*

[33] *State v. Ildefonso*, 262 Neb. 672, 634 N.W.2d 252 (2001).

concedes this with one exception. Susan notes in her brief that during this period of interrogation, she admitted that she had lied to the police in Minnesota. Susan stated that she was arrested in Minnesota because she told the Minnesota police officer that Tom had not slapped her, when in fact he had.

We first emphasize that this statement was not a confession. It was to some degree incriminating, because the jury was informed that Susan was arrested for an unknown offense. But the jury would not know from her interrogation statement why she was arrested and under what circumstances. The statement alone did not inform the jury that Susan had slapped Tom.

Additionally, any inference that Susan was arrested for assaulting Tom in Minnesota is cumulative to properly admitted evidence. In her statements made after 4:18 a.m., Susan mentioned the incident in Minnesota and told Ground that "I slapped him in Fairbury." Although her interrogation statement after 4:18 a.m. is not crystal clear as to exactly what happened in Minnesota, it does strongly mitigate the prejudice caused by the improper admission of her statements.

Further, the jury could infer from the relevant, untainted evidence that Susan had on different occasions assaulted Tom prior to the assault that resulted in his death. Susan, in her hospital statements, told McClure and Ground that Tom had been previously beaten by the "whore." This is consistent with Bauer's testimony, which was not objected to at trial or on appeal, that Tom would come to work every 2 to 3 weeks visibly sore with facial injuries, including black eyes and split lips. From this evidence, it is clear that Tom had been often assaulted prior to his death. When this evidence is considered with the evidence that Susan had lied about Tom's whereabouts before his murder, the alleged mistress' testimony that she had never harmed Tom, and Bauer's testimony that Tom had not suffered the injuries at work, a jury could reasonably infer that Susan was the one who had previously assaulted Tom on multiple occasions.

Therefore, there is no reason to believe that Susan's statements from 3:43 to 4 a.m. materially influenced the jury's verdicts. Susan's statements were cumulative and very minor relative to the rest of the untainted record. The admission by

the district court of Susan's interrogation statements from 3:43 to 4 a.m. was harmless error.

## Statements Made
### After 4:18 a.m.

Susan argues that her statements made after 4:18 a.m. should have been suppressed. Susan first argues that the statements made after 4:18 a.m. were involuntary, because it was a continuation of the ongoing interrogation. Second, Susan argues that she continued to provide answers only because the investigators had previously elicited inadmissible statements from 3:43 to 4:18 a.m. and that therefore, "the cat was already out of the bag."[34] We reject both of Susan's arguments and find that her statements after 4:18 a.m. were not required to be suppressed.

First, we find that at 4:18 a.m., Susan clearly invoked her right to end the questioning under her right to counsel when she stated, "I want a lawyer, please. I'm tired of this." The State concedes that this was a proper invocation for her right to an attorney.

The question to be answered is whether Susan voluntarily initiated the conversation after her 4:18 a.m. invocation. We find that she did. After Susan's invocation, both Farber and Ground ended the interrogation and left the room. Susan laid her head down for 30 seconds, then stood and grabbed her keys. She opened the door to the interrogation room to leave for a cigarette. Susan could not leave because she was in custody. Ground told Susan to sit back down, and Ground went to close the interrogation room's door. Without a question being asked, Susan began talking. Ground paused as she closed the door, reopened the door, and took a seat in a chair across from Susan. None of the actions of Ground can be construed as initiating the conversation. She simply told Susan to take a seat and then proceeded to leave. Only after Susan said "I'm sorry" to Ground, did Ground reenter the room.

Because Susan clearly initiated the conversation after her invocation for counsel, the second layer of protection outlined

---

[34] Brief for appellant at 62.

in *Edwards* is inapplicable. The police were "merely listening to [Susan's] voluntary, volunteered statements and using them against [her] at the trial."[35]

Additionally, the record establishes that at no time after Susan initiated the conversation did another interrogation begin. Interrogation includes not only express questioning, but also any words or actions that the police should have known were reasonably likely to elicit an incriminating response.[36] After 4:18 a.m., Ground did not ask Susan a question and Ground did not employ any form of modern interrogation techniques.

In interpreting *Rhode Island v. Innis*,[37] this court has stated that an objective standard is applied to determine whether there is interrogation within the meaning of *Miranda* and *Edwards*.[38] The question to be answered is: "'Would a reasonable and disinterested person conclude that police conduct, directed to a suspect or defendant in custody, would likely elicit an incriminating response from that suspect or defendant? . . . If the answer is "yes," there is interrogation . . . .'"[39]

From the interrogation video and transcript, we find the answer to be no. Susan's statements made after 4:18 a.m. were not made during an interrogation. Ground's actions did not elicit the incriminating responses. She did not threaten or persuade Susan into talking. Ground simply sat down at the interrogation table after Susan began speaking. "'[I]nterrogation occurs when a person is placed under a compulsion to speak.'"[40] Susan was not compelled to talk by Ground's actions or statements; Susan did so voluntarily. There was no interrogation after 4:18 a.m.

[16,17] Susan argues that she was compelled to talk because "the cat was already out of the bag" due to her previous

---

[35] See *Edwards v. Arizona*, *supra* note 11, 451 U.S. at 485.

[36] *Rhode Island v. Innis*, *supra* note 15.

[37] *Id*.

[38] *State v. Bormann*, *supra* note 8.

[39] *Id*. at 327, 777 N.W.2d at 836.

[40] *Id*. at 328, 777 N.W.2d at 836.

inadmissible statements. We disagree. The U.S. Supreme Court has stated that "after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good."[41] But the fact that the defendant has shared a secret in an inadmissible statement does not preclude the defendant from later waiving his or her constitutional rights after the conditions that induced the original statement have been removed.[42] The U.S. Supreme Court has explicitly rejected any "rigid rule" that suppresses the subsequent statement and has instead directed courts to focus on the voluntariness of any subsequent statement.[43] To do so, a court must evaluate the "entire course of police conduct" and the surrounding circumstances, including whether or not the conditions that made the first statement inadmissible had been removed.[44]

In *Missouri v. Seibert*,[45] the surrounding conditions made the subsequent statement inadmissible. In that case, the police purposefully did not give the suspect a warning of his rights to silence or counsel until the inadmissible interrogation had produced a confession.[46] Subsequent to the confession, the officer then gave the suspect his *Miranda* rights and then reinterrogated him until he confessed again. The U.S. Supreme Court held that the subsequent confession repeated after the *Miranda* warnings were given was inadmissible.[47] The plurality opinion reasoned that "[u]pon hearing warnings only in the

---

[41] *United States v. Bayer*, 331 U.S. 532, 540, 67 S. Ct. 1394, 91 L. Ed. 1654 (1947).

[42] *Oregon v. Elstad*, 470 U.S. 298, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985); *United States v. Bayer, supra* note 41.

[43] *Oregon v. Elstad, supra* note 42, 470 U.S. at 318.

[44] *Id.*

[45] *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004).

[46] See *id.*

[47] See *id.*

aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again."[48] The plurality surmised that the suspect would be perplexed as to why his or her rights were being discussed at that point.[49] Further, telling the suspect that what he or she says will be used against them creates an inference that the prior statements made by the suspect will be used against them. Thus, the actions of the officer are "likely to mislead and 'depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'"[50] In such a situation, the unwarned and warned interrogations blended into one "continuum."[51]

[18] But in Justice Kennedy's concurring opinion to *Seibert*, he reiterated that subsequent statements can be admissible if the "continuum" was broken by

> [c]urative measures . . . designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver. For example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn.[52]

And in *Bobby v. Dixon*,[53] the Court accordingly held that the "continuum" between two of the interrogations had been broken and that therefore, the subsequent confession was admissible. Archie Dixon was arrested for forgery and was interrogated

---

[48] *Id.*, 542 U.S. at 613.

[49] See *id.*

[50] *Id.*, 542 U.S. at 613-14 (quoting *Moran v. Burbine*, 475 U.S. 412, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986)).

[51] *Id.*, 542 U.S. at 617.

[52] *Id.*, 542 U.S. at 622 (Kennedy, J., concurring).

[53] *Bobby v. Dixon*, ___ U.S. ___, 132 S. Ct. 26, 181 L. Ed. 2d 328 (2011).

without receiving *Miranda* warnings. During this unwarned interrogation, Dixon readily admitted to obtaining an identification card from a murder victim and forging checks with the murder victim's signature. Dixon was booked for forgery and sent to a correctional facility.

Four hours later, Dixon was transported back to the police station. Prior to any police questioning, Dixon told the police, "'I talked to my attorney, and I want to tell you what happened.'"[54] The police read Dixon his *Miranda* rights, and Dixon signed a waiver. The interrogation began, and Dixon admitted to the murder but attempted to pin the blame on his accomplice.

The U.S. Supreme Court held that the admission of Dixon's murder confession was consistent with its precedent.[55] The Court noted that this was not the sort of two-step interrogation procedure condemned in *Seibert*.[56] It found that given all the circumstances, Dixon had a real choice about giving an admissible statement.[57] Four hours had passed between Dixon's unwarned interrogation and the receipt of his *Miranda* rights, he claimed to have spoken to his lawyer, and he had learned that the police had additional physical evidence.[58] As the Court stated, "this significant break in time and dramatic change in circumstances created 'a new and distinct experience,' ensuring that Dixon's prior, unwarned interrogation did not undermine the effectiveness of the *Miranda* warnings he received before confessing to [the victim's] murder."[59]

The U.S. Supreme Court reinstated the opinion of the Ohio Supreme Court and noted that its holding did not excuse the officer's decision to not give *Miranda* warnings before the first interrogation. But, the Court observed, the Ohio courts had already properly recognized the officer's failure and had

---

[54] *Id*., 132 S. Ct. at 28.

[55] See *Bobby v. Dixon, supra* note 53.

[56] See, *id*.; *Missouri v. Seibert, supra* note 45.

[57] See *Bobby v. Dixon, supra* note 53.

[58] *Id*.

[59] *Id*., 132 S. Ct. at 32 (quoting *Missouri v. Seibert, supra* note 45).

remedied it by excluding Dixon's forgery confession and the attendant statements.

Here, we find that the circumstances in the interrogation room had changed dramatically after Susan's third invocation and that the change gave Susan a real opportunity to make a voluntary statement. In coming to our holding, we evaluated the entire course of police conduct and the surrounding circumstances.[60] This was not a two-step interrogation technique as in *Seibert*. Susan was made fully aware of her rights before any statements were made. However, the police did ignore Susan's first two invocations and Farber continued to question Susan for an additional 35 minutes. During those 35 minutes, the interrogation did become more intense and Susan did make incriminating statements. Only when Susan requested an attorney did the interrogation stop and Farber and Ground left the room.

We have established that Farber had previously violated Susan's right to cut off questioning, and we do not excuse his conduct. But such conduct resulted in the district court's suppressing Susan's interrogation statements from 4 to 4:18 a.m. Although the district court did not suppress Susan's statements from 3:43 a.m., we have found that the admission of those statements was harmless. As in *Dixon*, the prior *Miranda* violations have been remedied.

The prior *Miranda* violations do not warrant suppression of Susan's statements made after 4:18 a.m. The circumstances of the entire situation indicate that the effectiveness of the *Miranda* warnings given to Susan was restored when Farber and Ground ended the interrogation upon Susan's request for an attorney. The actions of the investigators reasonably demonstrated to Susan that she had properly invoked her right to an attorney and that the interrogation was over. Susan faced "'a new and distinct experience.'"[61] After her two prior invocations, the questioning did not even momentarily stop. In both instances, the questioning continued and Susan, without further verbal resistance, continued to answer. Contrary to

---

[60] See *Oregon v. Elstad, supra* note 42.

[61] See *Bobby v. Dixon, supra* note 53, 132 S. Ct. at 32.

those experiences, Susan faced a new experience after her invocation for an attorney. She was no longer subject to modern interrogation techniques. The investigators stood and left the room, indicating a clear intention to end the interrogation. Susan was left alone.

And unlike in *Elstad* and *Seibert*, Susan initiated the second conversation. She was never again subjected to questioning. Susan made the decision to reinitiate the dialog with the investigators, and she was not explicitly attempting to clarify or explain her previous inadmissible statements. Susan, for whatever reason, wanted to tell more of her story. As the *Edwards* Court noted:

> It is not unusual for a person in custody who previously has expressed an unwillingness to talk or a desire to have a lawyer, to change his mind and even welcome an opportunity to talk. Nothing in the Constitution erects obstacles that preclude police from ascertaining whether a suspect has reconsidered his original decision. As Justice White has observed, this Court consistently has "rejected any paternalistic rule protecting a defendant from his intelligent and voluntary decisions about his own criminal case."[62]

Therefore, we affirm the district court's determination that Susan's prior statements, which were made after she invoked her right to end questioning, did not render inadmissible her statements made after her interrogation ended. We find that Susan's statements after 4:18 a.m. were initiated by Susan and were not the product of interrogation. Although the cat may have been, in some limited respects, out of the bag, the fact that the interrogation ended and the officers left the room had significantly changed the circumstances of the interrogation process and gave Susan a "real choice about giving an admissible statement."[63] Susan's statements after 4:18 a.m. were voluntary.

---

[62] *Edwards v. Arizona, supra* note 11, 451 U.S. at 490-91 (citing *Michigan v. Mosley, supra* note 20 (White, J., concurring in result)).

[63] *Missouri v. Seibert, supra* note 45, 542 U.S. at 612.

### Evidence Admitted at
### Rule 404 Hearing

Susan argues that the three prior bad acts admitted by the district court should have been suppressed. For purposes of this appeal, we are assuming, without deciding, that the admissions were in error. However, we find the erroneous admissions of the evidence to be harmless.

The State used the three prior bad acts to help link Susan to the murder by demonstrating her prior assaults on Tom. With all three prior bad acts, the testimony established that Tom had injuries similar to the injuries which caused his death and that the evidence implied the prior injuries were caused by Susan. The first incident was the Minnesota police officer's testifying to facial injuries suffered by Tom and the subsequent arrest of Susan. For the other incidents, the testimony from James and Sharon described only the injuries they witnessed on Tom and described Susan's explanations for the injuries. Neither James nor Sharon directly stated that Susan caused the injuries. The district court admitted the Minnesota event for the limited purposes of motive, intent, identity of perpetrator, and absence of mistake. The other two incidents were admitted for the limited purposes of intent, identity, and absence of mistake.

We begin our harmless error analysis by again noting that the untainted, relevant evidence strongly supports Susan's guilt. As already discussed, the evidence established that Susan had lied about Tom's going to South Dakota. The evidence established that Tom was assaulted in the 72 hours prior to his death and that during those 72 hours, Tom was at home with Susan. The DNA found on the hammer was consistent with Susan's swinging the hammer and bludgeoning Tom with the hammerhead. The medical experts agreed that Tom was murdered by blunt force trauma. The only other suggested suspect, Tom's alleged mistress, testified that she did not see Tom that week and that she did not harm Tom. This evidence, when considered with the instant messages and interrogation statements about self-defense, establishes Susan's guilt.

But strong evidence of guilt alone is not enough. We also find that for all three prior bad acts, there is cumulative

evidence establishing that Tom was often injured prior to his death and that the likely perpetrator was Susan. In the properly admitted statements after 4:18 a.m., Susan admitted that she had slapped Tom in Minnesota. Susan also stated that Tom had been previously beaten by the "whore." Susan also told investigators that Tom bruised easily and that she did not, implying that she had previously assaulted him. Susan explained to Ground that she was acting in self-defense, again indicating that Susan had assaulted Tom. Bauer testified that Tom would come to work visibly sore every 2 to 3 weeks with facial injuries, including black eyes and split lips. When considered with the evidence that Susan had lied about Tom's whereabouts to investigators and that she was angry at Tom for allegedly cheating on her, a jury could infer that Susan may have also been lying about Tom's prior injuries being the result of work or from beatings by the alleged mistress. From this evidence alone, the jury could infer that Tom's prior injuries were inflicted by Susan.

Additionally, the untainted evidence not only provided evidence of guilt but also established Susan's motive, her intent, her identity as the killer, and the absence of mistake in Tom's death. The evidence demonstrates that Susan was distraught over her belief that Tom was cheating and that she had the intent to kill him. The physical evidence also ties Susan directly to the possible murder weapon and places her as the only person with Tom the days before his death. The properly admitted testimony from Bauer, the alleged mistress, and the medical experts also establishes that Tom's injuries were not caused by mistake or accident. Bauer established that Tom was often injured but that Tom was not injured at work. The alleged mistress testified that she has never harmed Tom and had no reason to do so. The medical experts testified that Tom's injuries were not caused by a car accident or caused by normal activities at work. Even Susan's expert pathologist testified that Tom's death was the result of an assault. The jury had ample evidence that Tom's death was not a mistake, that Susan was the murderer, and that she had the motive and intent to commit the crime.

When viewed in relation to the whole record, the evidence erroneously admitted at the rule 404 hearing was insignificant. This evidence did not provide a crucial link to allow the State to make its case. In that sense, the evidence admitted at the rule 404 hearing was largely unnecessary. Thus, we hold that the erroneously admitted evidence was insignificant and did not materially influence the jury's verdicts. Any error was harmless.

## CONCLUSION

The district court did not err in admitting Susan's statements made after 4:18 a.m. into evidence. Although the district court erred by admitting Susan's statements from 3:43 to 4 a.m. and, assuming without deciding, erred by admitting all three prior bad acts, we find that all such errors were harmless. The convictions and sentences are affirmed.

AFFIRMED.

HEAVICAN, C.J., concurring.

I concur in the decision of the court affirming Susan's convictions and sentences. But I write separately because I disagree with the majority's conclusion that Susan's statements from 3:43 to 4 a.m. should have been suppressed. In my view, Susan's statements that she was done, tired, and wanted to go to sleep did not unambiguously invoke her right to remain silent.

In support of its conclusion that Susan's statements should have been suppressed, the majority cites to *State v. Rogers*.[1] In *Rogers*, this court held that a defendant's statement that she was "'done'" was sufficient to unambiguously invoke her right to remain silent.[2] But I dissented from this court's decision in *Rogers*, because I did not believe that the right to remain silent had been unambiguously invoked. I continue to believe that *Rogers* was wrongly decided and that the facts did not support a conclusion that the defendant had invoked her right to remain silent.

---

[1] *State v. Rogers*, 277 Neb. 37, 760 N.W.2d 35 (2009).

[2] *Id*. at 69, 760 N.W.2d at 61.

In considering whether a suspect has clearly invoked the right to remain silent, we review not only the words of the criminal defendant, but also the context of the invocation. Relevant circumstances include the words spoken by the defendant and the interrogating officer, the officer's response to the suspect's words, the speech patterns of the suspect, the content of the interrogation, the demeanor and tone of the interrogating officer, the suspect's behavior during questioning, the point at which the suspect allegedly invoked the right to remain silent, and who was present during the interrogation. A court might also consider the questions that drew the statement, as well as the officer's response to the statement.[3]

Of course, as this court noted in *Rogers*, a defendant's statement that he or she is "done," taken together with the surrounding circumstances, has been held by some courts to unambiguously invoke that defendant's right to remain silent. But this court and other courts, presented with different circumstances, have found to the contrary.[4] As this court noted in *State v. Schroeder*,[5] "[w]e have never held that any utterance of 'I'm done,' no matter what the surrounding circumstances or other statements, will be construed as cutting off all further questioning." Rather, the focus must be on those surrounding circumstances.

And in analyzing those circumstances in this case, I do not agree with the majority that Susan invoked her right to remain silent. Susan indicated that she was tired and done. She then began crying. On these facts, a reasonable officer could have assumed that she was frustrated, tired, and needed a break, but that she was not yet done answering questions. Farber was

---

[3] *Id.*

[4] See, *State v. Thomas*, 267 Neb. 339, 673 N.W.2d 897 (2004), *abrogated, Rogers, supra* note 1; *State v. Mata*, 266 Neb. 668, 668 N.W.2d 448 (2003), *abrogated, Rogers, supra* note 1. See, also, *People v. Lowin*, 36 A.D.3d 1153, 827 N.Y.S.2d 782 (2007); *State v. Saeger*, No. 2009AP2133-CR, 2010 WL 3155264 (Wis. App. Aug. 11, 2010) (unpublished disposition listed in table at 329 Wis. 2d 711, 790 N.W.2d 543 (2010)).

[5] *State v. Schroeder*, 279 Neb. 199, 218, 777 N.W.2d 793, 809 (2010).

permitted to clarify Susan's wishes,[6] which he did by asking whether she had questions for him. And when he so inquired, Susan indicated that she did, asking about the autopsy. Susan then willingly answered questions posed by Farber in connection with the coroner's report for the autopsy.

For the above reasons, I would conclude that Susan's statements from 3:43 to 4 a.m. did not need to be suppressed, because Susan did not unambiguously invoke her right to remain silent.

-------

[6] See *Berghuis v. Thompkins*, 560 U.S. 370, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010).

-------

State of Nebraska, appellee, v.
Marqus J. Patton, appellant.
___ N.W.2d ___

Filed April 11, 2014.    No. S-13-105.

1. **Constitutional Law: Witnesses: Appeal and Error.** An appellate court reviews de novo a trial court's determination of the protections afforded by the Confrontation Clause of the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution and reviews the underlying factual determinations for clear error.

2. **Constitutional Law: Due Process.** The determination of whether procedures afforded an individual comport with constitutional requirements for procedural due process presents a question of law.

3. **Judgments: Appeal and Error.** When issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below.

4. **Rules of Evidence: Appeal and Error.** The exercise of judicial discretion is implicit in the determinations of relevancy under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2008), and a trial court's decisions regarding them will not be reversed absent an abuse of discretion.

5. **Rules of Evidence: Other Acts: Appeal and Error.** It is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2012), and the trial court's decision will not be reversed absent an abuse of discretion.

6. **Criminal Law: Constitutional Law: Trial: Witnesses.** The right of a person accused of a crime to confront the witnesses against him or her is a fundamental